IN the INTEREST OF J.M.T., a Child

NO. 01-16-00940-CV

Court of Appeals of Texas,
Houston (1st Dist.).

Opinion issued April 6, 2017

Donald M. Crane, 810 South Mason Road, #350, Katy, TX 77450, for Appellant.

Vince Ryan, County Attorney, Harris County, TX, Sandra D. Hachem, Sr. Assistant County Attorney, 1019 Congress, 17th Floor, Houston, TX 77002, for Appellee.

Panel consists of Justices Jennings, Higley, and Massengale.

## OPINION

Laura Carter Higley, Justice

Following a bench trial, the trial court signed a judgment terminating the parent-child relationship between S.A.M. ("Father") and his one-year-old daughter, J.M.T. On appeal, Father identifies four issues, asserting that the evidence was not legally or factually sufficient to support the trial court's judgment. Because we hold that the evidence was legally and factually sufficient, we affirm.

## Background

On September 3, 2015, the Department of Family and Protective Services ("the Department") filed suit, seeking to terminate Father's parental rights to J.M.T. and to obtain sole managing conservatorship if family reunification could not be achieved. In the petition, the Department also sought temporary managing conservatorship and requested emergency orders.

To support the request for emergency orders, the Department offered the affidavit of its investigator, J. Cash. In her affidavit, Cash testified that on September 2, 2015, the Department had received a referral regarding 12-day-old J.M.T., who was in the neonatal unit of a local hospital. J.M.T. had been born prematurely on August 21, 2015 but was ready to be discharged from the hospital. The report had expressed concern that J.M.T.'s mother ("Mother") could not care for J.M.T. because Mother was homeless and had not addressed her mental illness.

Cash's affidavit indicated that her investigation of the referral confirmed that Mother was homeless and had been unable to secure housing for J.M.T. upon the newborn's discharge from the hospital. She also learned that Mother suffered from bipolar disorder and depression for which she had not received mental health treatment. Cash discovered that Mother also struggled with daily tasks, such as grocery shopping, and may have an undiagnosed intellectual disability. In the affidavit, Cash also averred that Mother's parental rights had been previously terminated to another daughter based on allegations that Mother had physically abused and neglected that child. Mother's untreated mental illness and alcohol abuse had also been factors leading to the termination of her parental rights in that case.

Investigator Cash also learned of Father's whereabouts from Mother. When contacted, Father told Cash that he was willing to care for J.M.T. However, Cash determined that Father was living in "a single room occupancy at New Hope Housing," which was not a suitable living environment for J.M.T. In addition, Cash learned that Father had a "criminal history [dating] back to 1974, [which] included prison sentences for delivery of crack cocaine, unlawful carrying of a weapon, robbery, possession of marijuana and obstruction/retaliation."

Based on her investigation, Cash stated, "Due to [Mother's] unknown mental health status and her inability to provide a safe and stable environment for her child, it is in the best interest of the child to be placed in protective custody at this time. Despite the agency asking [Mother] for possible placement alternatives, there are no available, suitable relatives for placement at this time."

On September 3, 2015, the trial court signed an emergency order for the protection of J.M.T. Following a full adversary hearing, the trial court signed a temporary order on September 17, 2015, appointing the Department as J.M.T.'s temporary managing conservator.

The trial court conducted a status hearing on October 29, 2015, attended by Father and his counsel. Following the hearing, the trial court signed a status hearing order, approving and incorporating by reference the Department's family service plan, making the service plan an order of the trial court.[1] In the order, the trial court found that Father had reviewed the service plan, understood it, and had signed it.

1. The trial court also approved a family service plan for Mother. Because Mother did not appeal, we focus on the events in the trial court that are pertinent to Father's appeal.

The court-ordered service plan set out several tasks and services for Father to complete before unification with J.M.T. could occur. These tasks and services included the following: (1) participate in a psychosocial evaluation and follow all recommendations resulting from the evaluation; (2) refrain from engaging in any illegal and criminal activities; (3) complete an 8-week parenting class; (4) participate in a drug and alcohol assessment and follow all recommendations resulting from the assessment; (5) provide urine samples for random drug testing; (6) maintain safe and stable housing and provide the Department's caseworker with proof of housing; (7) obtain regular employment and provide proof in the form of paycheck stubs to the caseworker. The family service plan also informed Father that its purpose was to assist him in providing a safe environment for J.M.T. The plan warned Father that if he was "unwilling or unable to provide [J.M.T.] with a safe environment, [his] parental … rights may be restricted or terminated or [J.M.T.] may not be returned to you."

The trial court held permanency hearings on February 11, 2016 and on June 8, 2016. The trial court signed orders following each hearing in which the court found that Father had "not demonstrated adequate and appropriate compliance with the service plan."

The case was tried to the bench on November 1, 2016. At trial, the Department sought to terminate the parent-child relationship between Father and J.M.T.[2] The Department offered the testimony of its caseworker, M. Thomas, who had been assigned to J.M.T.'s case since its inception. Thomas testified that, at the beginning of the case, she made the necessary referrals to enable Father to complete the services required by the plan. At that time, Father had admitted to Thomas that he was using marijuana and cocaine. Thomas made a referral for Father to obtain a substance abuse assessment and to attend outpatient substance counseling. In addition, to learn to care for J.M.T., Thomas referred to Father to parenting classes and to individual counseling.

Thomas also testified that the trial court ordered that Father could not have visitation with J.M.T. until he had a negative drug test. The State offered Father's urinalysis test results into evidence. The results showed that Father's urinalysis results were positive for cocaine in September 2015 and were positive for cocaine and marijuana in October 2015. Father admitted at a court hearing in June 2016 that he had smoked marijuana laced with cocaine. His urinalysis test results that month were positive for alcohol, cocaine, and marijuana. Father tested positive for alcohol use in September 2016.

Father's urinalysis test results were negative in February 2016 and in July 2016. Following these negative results, Father was requested to provide hair or fingernail samples for "zero tolerance" drug testing. Thomas testified that Father refused to provide the hair and nail samples. Thomas testified that Father never was permitted to visit J.M.T. during the entire pendency of the case due to his positive drug tests and his refusal to provide hair or fingernail samples.

Thomas further testified that Father failed to maintain contact with her during

---

2. Mother's parental rights were also terminated. At trial, the evidence showed that, after she tested positive for cocaine at the beginning of the case, Mother disappeared. The Department did not know Mother's whereabouts at the time of trial. She was, however, represented at trial by appointed counsel. As mentioned, Mother does not appeal the termination of her parental rights.

periods of time while the case was pending. Thomas stated that she reviewed the service plan with Father on October 29, 2015, but then, she and Father had no contact until February 2016 when she made contact with Father at a court hearing. Thomas testified that, at that time, she had again discussed with Father what he needed to do under the family service plan. Thomas testified that, after the February 2016 hearing, Father again "failed to maintain contact or try to facilitate any arrangements to get [the] assessments completed."

Thomas stated that she had no contact with Father until June 2016 when she saw him at another hearing. It was at this hearing that Father admitted that he had the previous week smoked marijuana laced with cocaine. Also at the hearing, Father claimed that the Department had not sent the required authorizations for him to complete services. Thomas testified that the Department then "re-sent all service authorizations," including referrals for a substance abuse assessment, substance abuse counseling, and individual therapy. Thomas acknowledged that Father completed a substance abuse assessment and a psychosocial assessment as required by the service plan. The service plan also required Father to complete any recommendations made as a result of the assessments.

The substance-abuse assessment recommended that Father engage in substance-abuse counseling, and both assessments recommended individual counseling for Father. Thomas testified that Father did not successfully complete substance-abuse counseling because "they cannot discharge him because we do not have a drug test to support his level of sobriety at this time." She also testified that Father was not discharged from his individual counseling.

In addition, Thomas testified that Father had not provided her with proof that he had suitable housing. Father had told Thomas that he was living in "a single room occupancy." Thomas testified, "[Father's] informed me, as well as the Court, that [the room is] about 200 square feet and that that is not suitable for him and a child, an infant child." Thomas stated that Father told her that he was looking for a larger place so that he could be united with J.M.T. Thomas stated that she was aware that Father had set up an assessment in September 2016 with a housing services agency, but she did not know the results of the assessment. Thomas confirmed that, at the time of trial, Father "has not provided any proof of stable housing to show that he can provide a safe and stable home for this child."

Thomas further testified that Father never provided her with proof of employment or of income. Thomas acknowledged that Father told her that he was disabled. She testified that she asked Father, as early as October 2015, for documentation to confirm his disability and to show that he received some type of income. Thomas also stated that Father never provided any documentation to her to show that he was disabled, that he had an income, or that he was seeking employment.

Thomas also testified that one-year-old J.M.T. is currently placed in a home with a foster mother. Thomas confirmed that the foster mother wishes to adopt J.M.T. Thomas stated that she had visited the foster home and had observed that it is a clean, safe, and stable home for J.M.T. Thomas also confirmed that, from her observations, the foster mother has good parenting abilities and provides for all of J.M.T.'s physical and emotional needs. Thomas confirmed that, in her foster home, J.M.T. has her own room and will be able to attend a good school. Thomas also testified that the foster mother had also

indicated that she will ensure that J.M.T. receives an education, including college.

Lastly, Thomas testified that J.M.T. has special needs. Specifically, J.M.T. has growth and fine motor skill delays for which she receives services. Thomas confirmed that the foster mother was seeking out the services required for J.M.T.'s special needs.

The State also called the foster mother to testify at trial. She stated that 14-month-old J.M.T. is "doing very well" and "thriving" in her home. She also confirmed that she and J.M.T. had bonded.

With respect to J.M.T.'s special needs, the foster mother testified that J.M.T. has a speech delay and also delays relating to her fine and gross motor skills. For example, J.M.T. did not roll over for the first time until she was nine-months old and did not crawl until she was 12-months old.

The foster mother testified that J.M.T. receives treatment for her delays. The foster mother also described the nature and the frequency of the therapy that J.M.T. receives. She stated, "Every day [J.M.T.] has to have exercises for her abs and her legs. So, it's about, at least 30 minutes in the evening, and then the day care also has specific instructions that they have to give her exercises throughout the day." The foster mother further said that J.M.T. sees "a development specialist twice a month and then she has a physical therapist twice a month." She stated that J.M.T. will be reevaluated in six to nine months to determine whether she needs to continue therapy. The foster mother also stated that her cousin is available to assist when she needs help to care for J.M.T.

The foster mother testified that she has "a safe and stable" home, which she has lived in for 14 years. She also confirmed that she has stable employment. She testified that she has worked as an educator

for 22 years and continues to work. She stated that J.M.T. attends daycare while she works and that the daycare does the required exercises with J.M.T. to address her delays. The foster mother confirmed that, in the evening, she also does the necessary exercising with J.M.T. for 30 minutes, which she incorporates into J.M.T.'s play and bath time.

With regard to her plans for J.M.T., the foster mother testified that she "would love" to adopt J.M.T. She stated that she wants J.M.T. to attend college and "to be a successful person."

Father also testified at trial. With regard to J.M.T.'s special needs, Father stated that he would seek out services to address those needs. Father indicated that he does not have any family member that can assist with J.M.T.'s care. However, he stated that he "would be able to be there with [J.M.T.] practically 24 hours a day because I do receive disability."

Father testified that he was last employed in 2009, working as a forklift operator. Father stated that he is 60 years old and is not currently able to work. He testified that he is disabled due to injuries to his spine and to his knee. He disputed Thomas's claim that he had not provided documentation of his disability, testifying that he gave Thomas the documentation at one of the hearings while the case was pending.

Father testified that he receives $733 per month in disability payments. He testified that he has inquired about obtaining a brace for his back and for his knee so that he can obtain a part-time job. He also stated that he plans to move into a larger apartment.

Father acknowledged that he used illegal drugs while the case was pending but stated that was "at the beginning" of the case. However, he also acknowledged that

he had admitted at the June 2016 hearing that he had, around that time, smoked marijuana laced with cocaine.

At the conclusion of trial, the court granted the Department's request for termination of the parent-child relationship between Father and J.M.T. On November 8, 2016, the trial court signed a judgment terminating Father's parental rights. In support of the termination, the trial court found that termination was in J.M.T.'s best interest. The trial court also found that Father had engaged in the predicate acts listed in Family Code Subsections 161.001(b)(1),(E),(O), and (P). Specifically, the trial court found that clear and convincing evidence showed (1) Father had engaged in conduct or knowingly placed J.M.T. with persons who engaged in conduct that endangered their physical or emotional well-being (Subsection (E)); (2) Father had failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of J.M.T. (Subsection (O)); and (3) Father used a controlled substance in a manner that endangered the health or safety of J.M.T. and failed to complete a court-ordered substance abuse treatment program; or, after completion of a court-ordered substance abuse treatment program, continued to abuse a controlled substance (Subsection (P)). The trial court also appointed the Department to be J.M.T.'s sole managing conservator.

Father now appeals the trial court's judgment, challenging the termination of his parental rights. Father's first three issues address the legal and factual sufficiency of the evidence to support the trial court's findings regarding the predicate acts listed in Family Code Subsections 161.001(b)(1),(E),(O), and (P). In his fourth issue, Father asserts that the evidence was not legally or factually sufficient to support the trial court's finding that termination of

the parent-child relationship was in J.M.T.'s best interest.

## A. Standard of Review

■ Termination of parental rights requires proof by clear and convincing evidence. *See* TEX. FAM. CODE ANN. § 161.001(b) (Vernon Supp. 2016). The Family Code defines clear and convincing evidence as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2014); *see also In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Here, the Department was required to establish, by clear and convincing evidence, that Father's actions satisfied one of the predicate grounds listed in Family Code section 161.001(b)(1) and that termination was in the children's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)–(2).

■ When determining legal sufficiency, we review all the evidence in the light most favorable to the trial court's finding "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d at 266. To give appropriate deference to the fact finder's conclusions, we must assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so. *Id.* We disregard all evidence that a reasonable fact finder could have disbelieved or found to have been not credible. *Id.* This does not mean that we must disregard all evidence that does not support the finding. *Id.* The disregard of undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence. *Id.* Therefore, in conducting a legal-sufficiency review in a parental-termination case, we must consider all of the evidence, not only

that which favors the verdict. *See City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005).

In determining a factual-sufficiency point, the higher burden of proof in termination cases also alters the appellate standard of review. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). "[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance." *Id.* at 25. In considering whether evidence rises to the level of being clear and convincing, we must consider whether the evidence is sufficient to reasonably form in the mind of the fact finder a firm belief or conviction as to the truth of the allegation sought to be established. *Id.* We consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

We give due deference to the fact finder's findings, and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109.

## B. Predicate Finding under Subsection 161.001(b)(1)(O)

In his second issue, Father asserts that the evidence was legally and factually insufficient to support the trial court's predicate finding that termination was warranted under Family Code subsection 161.001(b)(1)(O). Family Code subsection 161.001(b)(1)(O) provides that the court may order termination of the parent-child relationship if the court finds by clear and convincing evidence

that the parent has failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under [Family Code] Chapter 262 for the abuse or neglect of the child.

TEX. FAM. CODE ANN. § 161.001(b)(1)(O).

Thus, pursuant to Subsection (O), the Department must prove that (1) it has been the child's temporary or permanent managing conservator for at least nine months; (2) it took custody of the child as a result of a removal from the parent under Chapter 262 for abuse or neglect; (3) a court issued an order establishing the actions necessary for the parent to obtain the return of the child; and (4) the parent did not comply with the court order. *See id.* Here, Father does not dispute that (1) the Department had been J.M.T.'s temporary managing conservator for at least nine months; (2) the Department had taken custody of J.M.T. as a result of a removal from the parent under Chapter 262 for abuse or neglect; and (3) the court-ordered family service plan constituted an order of the trial court, establishing the actions necessary for him to be united with J.M.T. Instead, on appeal, Father disputes whether the evidence was legally and factually insufficient to show that he failed to comply with the court-ordered service plan.

At trial, Thomas testified that Father had failed to complete many of the

required tasks and services listed in the family service plan, which was admitted into evidence. Thomas testified that, in noncompliance with the plan, Father failed to provide proof that he had been employed for six months. She acknowledged that Father said that he was disabled, but she stated that Father never provided her proof of his disability or disability income. Father disputed this, testifying at trial that he had provided paperwork to Thomas regarding his disability. However, "[i]t is well established that, in a bench trial, the judge as the trier of fact weighs the evidence, assesses the credibility of witnesses and resolves conflicts and inconsistencies." *In re D.D.D.K.*, No. 07-09-0101-CV, 2009 WL 4348760, at *6 (Tex. App.–Amarillo Dec. 1, 2009, no pet.) (mem. op.). Thus, the trial court was free to disbelieve Father's testimony, including his testimony that he had provided Thomas with evidence of his disability, and to believe Thomas's testimony that she received no proof from Father.

Father also failed to maintain safe and stable housing as required by the service plan. The evidence showed that Father lived in a 200-square-foot, single-occupancy room that was not suitable as a residence for J.M.T. Thomas acknowledged that Father had applied to a housing agency regarding assistance to obtain suitable housing for himself and J.M.T., but she stated that Father never provided proof to her that he had obtained suitable housing.

The evidence further showed that Father used cocaine and marijuana while the case was pending. Father's illegal drug use prevented him from complying with the service plan because the plan required Father "[to] refrain from engaging in any illegal and criminal activities or associating with others who engage in criminal activities."

▇▇ Father points out in his brief that Thomas "testified that [Father] completed some services related to the family [service] plan." Father notes that he "completed a psychological assessment and has engaged in individual therapy, substance abuse assessment, and substance abuse counseling." However, as the Department points out "[s]ubstantial or partial compliance with a court-ordered [family service plan] is insufficient to avoid termination." *In re C.A.W.*, No. 01-16-00719-CV, 2017 WL 929540, at *5 (Tex. App.—Houston [1st Dist.] Mar. 9, 2017, no pet.) (mem. op.) (citing *In re T.T.*, 228 S.W.3d 312, 319–20 (Tex. App.—Houston [14th Dist.] 2007, pet. denied); *In re J.F.C.*, 96 S.W.3d at 278 ("[S]poradic incidents of partial compliance do not alter the undisputed fact that the parties violated many material provisions of the trial court's orders."); *In re M.C.G.*, 329 S.W.3d 674, 676 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) ("The Family Code does not provide for substantial compliance with a family service plan."); *Liu v. Dep't of Family & Protective Servs.*, 273 S.W.3d 785, 801–02 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (affirming termination of mother's parental rights despite partial compliance with family service plan)).

▇▇ "Texas courts generally take a strict approach to subsection (O)'s application." *Id.* at *4 (citing *In re D.N.*, 405 S.W.3d 863, 877 (Tex. App.—Amarillo 2013, no pet)). "A parent's failure to complete one requirement of her [family service plan] supports termination under subsection (O)." *Id.* at *5 (citing TEX. FAM. CODE ANN. § 161.001(b)(1)(O); *In re M.C.G.*, 329 S.W.3d at 675). Here, although the evidence showed that he completed some of the plan's requirements, the evidence conclusively showed that Father did not comply with all of the requirements of the court-ordered service plan. *See In re*

*M.C.G.*, 329 S.W.3d at 675 (determining that parent's failure to complete one requirement of her service plan supports termination); *In re J.S.*, 291 S.W.3d 60, 66–67 (Tex. App.—Eastland 2009, no pet.) ("Despite [parent]'s achievement of some of the plan's goals, the evidence establishes that other requirements of the plan were not achieved.").

Reviewing all of the evidence in the light most favorable to the termination findings, we conclude that a reasonable fact finder could have formed a firm belief or conviction as to the truth of the termination findings under subsection (O). *See In re J.F.C.*, 96 S.W.3d at 266. In light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the termination finding under subsection (O) is not so significant that a fact finder could not reasonably have formed a firm belief or conviction as to the truth of the termination finding under that subsection. *See In re H.R.M.*, 209 S.W.3d at 108. We hold that the evidence is legally and factually sufficient to support the trial court's predicate finding under Subsection (O). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(O).

We overrule Father's second issue.[3]

## C. Best-Interest Finding

In his fourth issue, Father challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of the parent-child relationship was in J.M.T.'s best interest.

### 1. *Legal Standards*

**3.** Because only one predicate ground is needed to support a termination order, we need not address Father's other issues, regarding the legal and factual sufficiency of the evidence to support the trial court's findings under Subsections 161.001(b)(1)(E) and (P).

There is a strong presumption that the best interest of the child will be served by preserving the parent–child relationship. *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a) (Vernon Supp. 2016).

The Supreme Court of Texas has identified factors that courts may consider when determining the best interest of the child, including: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individual seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by the individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent–child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). This is not an exhaustive list, and a court need not have evidence on every element listed in order to make a valid finding as to the child's best interest. *In re C.H.*, 89 S.W.3d at 27. While no one factor is controlling, analysis of a single factor may be adequate in a particular factual situation to support a finding that termination is in the best interest of the child. *In re A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.). In addition, the Texas Family Code sets out fac-

*See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (recognizing, "Only one predicate finding" under section 161.001(b)(1) "is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest.").

tors to be considered in evaluating a parent's willingness and ability to provide the child with a safe environment. *See* Tex. Fam. Code Ann. § 263.307(b); *see also In re R.R.*, 209 S.W.3d at 116 (citing Family Code Section 263.307 and *Holley* as containing factors to consider "when determining whether termination of parental rights is in the best interest of the child").

The evidence supporting the statutory predicate grounds for termination may also be used to support a finding that the best interest of the child warrants termination of the parent–child relationship. *C.H.*, 89 S.W.3d at 28; *In re H.D.*, No. 01-12-00007-CV, 2013 WL 1928799, at *13 (Tex. App.—Houston [1st Dist.] May 9, 2013, no pet.) (mem. op.). Furthermore, in conducting the best-interest analysis, a court may consider not only direct evidence but also may consider circumstantial evidence, subjective factors, and the totality of the evidence. *In re H.D.*, 2013 WL 1928799, at *13.

### 2. Analysis

Multiple factors support the trial court's determination that termination of Father's parental rights was in J.M.T.'s best interest. The trial court heard evidence that Father engaged in illegal drug use while this case was pending. Thomas testified that, at the beginning of the case, Father admitted to her that he was using marijuana and cocaine. The drug-test results, admitted into evidence, showed that Father's urinalysis results were positive for cocaine in September 2015 and were positive for cocaine and marijuana in October 2015 Father admitted at a court hearing in June 2016 that he had recently smoked marijuana laced with cocaine. He tested positive for alcohol, cocaine, and marijuana that same month. The evidence also showed that Father refused to provide hair and fingernail samples for zero tolerance drug testing, permitting the trial court, as fact finder, to infer that Father refused testing because it would be positive. *See In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.) (recognizing that fact finder could reasonably infer that parent's failure to complete scheduled screenings indicated she was avoiding testing because she was using drugs).

Parental drug abuse reflects poor judgment and may be a factor to consider in determining a child's best interest. *In re M.R.*, 243 S.W.3d 807, 820 (Tex. App.—Fort Worth 2007, no pet.); *see also* Tex. Fam. Code Ann. § 263.307(b)(8) (stating courts may consider whether there is history of substance abuse by child's family or others who have access to child's home). "A parent's exercise of poor judgment currently and in the past demonstrates an inability to provide adequate care for the child." *In re J.M.*, No. 01-14-00826-CV, 2015 WL 1020316, at *7 (Tex. App.—Houston [1st Dist.] Mar. 5, 2015, no pet.) (mem. op.).

The evidence of Father's illegal drug use also supports an inference that he is at risk for continuing drug use. *See In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied) (recognizing that trial court may measure a parent's future conduct by his past conduct). Such inference is relevant not only to the stability of Father's home but also to J.M.T.'s emotional and physical needs now and in the future and to the and physical danger in which J.M.T. could be placed now and in the future. *See Holley*, 544 S.W.2d at 371–72 (listed above factors two, three, and seven); *see also In re J.M.*, 2015 WL 1020316, at *7 (recognizing that parent's drug use is condition indicative of instability in home environment).

In addition, the evidence showing that Father failed to complete all of the

tasks and services required in his service plan supports the trial court's best-interest finding. *See In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013) (holding that finding that parent failed to complete court-ordered services can support best-interest finding). A fact finder may infer from a parent's failure to take the initiative to complete the services required to regain possession of his child that he does not have the ability to motivate himself to seek out available resources needed now or in the future. *See In re J.M.*, 2015 WL 1020316, at *7; *see also Holley*, 544 S.W.2d at 371–72 (listing parental abilities of individual seeking custody as best-interest factor). The evidence also showed that, despite being offered substance-abuse counseling and individual therapy, Father did not refrain from illegal drug use and did not complete either program. *See Holley*, 544 S.W.2d at 371–72 (listing programs available to assist these individuals to promote best interest of child as best-interest factor); *see also* Tex. Fam. Code Ann. § 263.307(b)(10), (11) (stating courts may consider willingness and ability of the child's family to seek out, accept, and complete counseling services and willingness and ability of child's family to effect positive environmental and personal changes within reasonable period of time).

The undisputed evidence showed that Father did not have adequate housing to care for J.M.T. at the time of trial. Thomas testified that Father had made efforts to obtain better housing with an agency, but Father never offered proof that he was successful in obtaining suitable housing.

Furthermore, although Father testified that he received $733 in disability income and had provided the Department with evidence of his disability, Thomas testified that Father had not provided proof to her of his disability or of his income. Father testified that he planned to obtain part-

time work; however, there was no evidence that Father would be able to obtain employment or increase his income. This evidence was relevant because "[a] parent who lacks stability, income, and a home is unable to provide for a child's emotional and physical needs." *In re J.R.W.*, No. 14-12-00850-CV, 2013 WL 507325, at *9 (Tex. App.—Houston [14th Dist.] Feb. 12, 2013, pet. denied) (mem. op.); *see also Holley*, 544 S.W.2d at 371–72 (factor two: identifying emotional and physical needs of child now and in the future as factor in assessing child's best interest).

In comparison, the evidence showed that the foster mother had a safe, stable home in which she had lived for 14 years. She had been employed as an educator for 22 years and continued to be employed. The evidence further indicated that J.M.T. is doing well in foster care and that all of her physical and emotional needs are met. *See In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (stating that stability and permanence are important to upbringing of a child and affirming finding that termination was in child's best interest when child was thriving in foster care). This evidence supports the trial court's best-interest finding under the following factors: the emotional and physical needs of the child now and in the future and the stability of the home or proposed placement. *See Holley*, 544 S.W.2d at 371–72 (factors two and seven).

We also note that J.M.T. was only 14 months old at the time of trial. As such, the *Holley* factor regarding the desires of the child is neutral in this case. *See id.* (factor one). However, J.M.T.'s young age does weigh in favor of the best-interest determination. *See* Tex. Fam. Code Ann. § 263.307(b)(1) (providing that court may consider child's age and physical and mental vulnerabilities in best-interest determination). The foster mother testified that,

because of her age, J.M.T. requires 24 hour care.

The evidence also showed that, in addition to her young age, J.M.T. has special needs because she has developmental delays. Thomas testified that J.M.T. does receive specialized services to address the delays. *See Holley*, 544 S.W.2d at 371–72 (factor five: programs available to assist these individuals to promote best interest of child). The foster mother explained that J.M.T. must be assisted to engage in specialized exercising every day. She testified that she and J.M.T.'s daycare ensures that J.M.T. engages in these exercises. Thomas testified that she had observed the foster mother with J.M.T. and that the foster mother had good parenting abilities. *See id.* (factor four: the parental abilities of the individual seeking custody); *see also* TEX. FAM. CODE ANN. § 263.307(b)(12)(F) (providing court may consider whether family has understanding of child's needs and capabilities).

Father testified that he would ensure that J.M.T. received whatever services she requires for her special needs. Father also pointed out that, because he is disabled, he could be with J.M.T. 24 hours a day. However, given his illegal drug use, failure to complete services, and his failure to maintain contact with Thomas during the suit, the trial court could have reasonably inferred that Father did not have the necessary parental abilities to care for a young special-needs child.

In addition, evidence was presented showing that the foster mother and J.M.T. have bonded. *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (considering child's bond with foster family in reviewing best-interest determination). By comparison, the evidence showed that Father had no contact with J.M.T. because the trial court conditioned visitation on Father having a negative drug test.

The foster mother also testified that her cousin is available to assist when she needs help to care for J.M.T. Father's testimony indicated that he did not have a support network to help care for J.M.T. *See* TEX. FAM. CODE ANN. § 263.307(b)(13) (stating court may consider whether adequate social support system consisting of extended family and friends is available to child).

With regard to her plans for J.M.T., the foster mother indicated a strong desire to adopt J.M.T. She testified that she hopes J.M.T. grows up to be successful. *See Holley*, 544 S.W.2d at 371–72 (factor six: the plans for the child by those seeking custody). She stated that she would ensure that J.M.T. receives an education, including college.

When asked about his plans for J.M.T., Father testified "I would raise that child like she was the last thing on earth for me, sir. I love my daughter. I respect her and I would take care of her. I would let no harm come to her." Father also testified that he was pleasantly surprised to become a father at nearly 60 years of age, stating J.M.T. is "a gift from God." Father points to this and other evidence, such as his ability to be with J.M.T. 24 hours a day and his disability income, to counter the best-interest finding. Although there is some evidence weighing against the best-interest finding, evidence cannot be read in isolation; it must be read in the context of the entire record. *See In re K.C.F.*, No. 01-13-01078-CV, 2014 WL 2538624, at *16 (Tex. App.—Houston [1st Dist.] June 5, 2014, no pet.) (mem. op.). As discussed, evidence was presented indicating that that Father would continue to use illegal drugs and could not provide a stable and suitable home for J.M.T.

After viewing all of the evidence in the light most favorable to the best-interest

finding, we conclude that the evidence was sufficiently clear and convincing that a reasonable factfinder could have formed a firm belief or conviction that termination of the parent-child relationship between Father and J.M.T. was in the child's best interest. *In re J.F.C.*, 96 S.W.3d at 266. We further conclude that, viewed in light of the entire record, any disputed evidence could have been reconciled in favor of the trial court's finding that termination of the parent-child relationship between Father and J.M.T. was in her best interest or was not so significant that the trial court could not reasonably have formed a firm belief or conviction that termination was in J.M.T.'s best interest. *See In re H.R.M.*, 209 S.W.3d at 108. Therefore, after considering the relevant factors under the appropriate standards of review, we hold the evidence is legally and factually sufficient to support the trial court's finding that termination of the parent-child relationship was in J.M.T.'s best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2).

We overrule Father's fourth issue.

## Conclusion

The trial court affirms the judgment of the trial court.

Justice Massengale, concurring in the judgment.

Michael Massengale, Justice, concurring.

The father in this appeal conceded the sufficiency of the evidence to support the trial court's finding that he endangered his child by use of a controlled substance under the circumstances described in Family Code section 161.001(b)(1)(P).[1] I therefore decline to join the majority's unnecessary dictum, which analyzes whether the evidence was sufficient to support the trial court's additional finding that the father failed to comply with the provisions of a court order under the circumstances described in Family Code section 161.001(b)(1)(O).[2]

Only one predicate finding under section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest.[3] Accordingly, it is a well-established and often-invoked principle of appellate review in this court that when an appellant fails to challenge all of the predicate grounds found by a trial court under section 161.001(b)(1) in support of a termination decree, any complaint about the sufficiency of the evidence to support the unchallenged findings is waived, and the court need not address other predicate grounds that are challenged on appeal.[4]

1. "The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence ... that the parent has ... used a controlled substance, as defined by Chapter 481, Health and Safety Code, in a manner that endangered the health or safety of the child, and: (i) failed to complete a court-ordered substance abuse treatment program; or (ii) after completion of a court-ordered substance abuse treatment program, continued to abuse a controlled substance...." Tex. Fam. Code § 161.001(b)(1)(P).

2. "The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence ... that the parent has ... failed to comply with the pro-

visions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child...." Tex. Fam. Code § 161.001(b)(1)(O).

3. *E.g., In re A.V.*, 113 S.W.3d 355, 362 & n.39 (Tex. 2003).

4. *E.g., In re A.H.L.*, No. 01-16-00784-CV, 2017 WL 1149222, at *3 & n.* (Tex. App.—Houston [1st Dist.] Mar. 28, 2017, no pet. h.) (mem.

This sound and prudent rule reflects the "cardinal principle" of judicial restraint: "if it is not necessary to decide more, it is necessary not to decide more."[5]

With these observations, I concur solely in the judgment affirming the decree of termination.

op.) (noting the waste of "both appointed-lawyer resources and judicial resources" occasioned by purporting to challenge a predicate ground for termination while "simultaneously defeating" that issue "by conceding the sufficiency of at least one predicate ground"); *In re T.L.B.*, No. 01-16-00806-CV, 2017 WL 1019520, at *10 n.5 (Tex. App.—Houston [1st Dist.] Mar. 16, 2017, no pet. h.) ("Because only one predicate ground is needed to support a termination order, we need not address Mother's other sub-issues. . . ."); *In re D.E.B.*, No. 01-16-00562-CV, 2016 WL 7671378, at *5 (Tex. App.—Houston [1st Dist.] Dec. 22, 2016, pet. filed) (mem. op.) ("Because Mother concedes that at least one predicate finding is supported by legally and factually sufficient evidence, we not need not address her first three issues, challenging the

sufficiency of the evidence to support the other predicate findings."); *In re J.-M.A.Y.*, No. 01-15-00469-CV, 2015 WL 6755595, at *4 (Tex. App.—Houston [1st Dist.] Nov. 5, 2015, pet. denied) (mem. op.) ("Because the judgment could be affirmed on . . . unchallenged grounds, we uphold the judgment concerning the statutory grounds for termination and do not address Mother's challenge to the sufficiency of the evidence under subsection (E)."); *Toliver v. Tex. Dept. of Family & Protective Servs.*, 217 S.W.3d 85, 102 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

5. *VanDevender v. Woods*, 222 S.W.3d 430, 433 (Tex. 2007) (quoting *PDK Labs., Inc. v. U.S. Drug Enforcement Admin.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring)).