**Opinion issued March 12, 2026.**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-25-00846-CV**

———————————

**IN THE INTEREST OF A.Y., A CHILD**

———————————————

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Case No. 2024-02054J**

———————————————

**MEMORANDUM OPINION**

This accelerated appeal arises from a suit brought by the Texas Department of Family and Protective Services ("DFPS") to terminate a parent-child relationship. After a bench trial, the trial court terminated the parental rights of A.Y. ("Mother") to her minor child, "Adam,"[1] based on its findings that she engaged in the

---

[1] We use aliases for the child and Father to protect the child's identity. *See* TEX. R. APP. P. 9.8(b)(2).

endangerment grounds for termination and failed to comply with the court-ordered family service plan requirements,[2] and that termination of the parent-child relationship was in Adam's best interest.[3]

Mother challenges the trial court's ruling in six issues, contending the evidence is legally and factually insufficient to support the trial court's findings supporting the termination of Mother's parental rights, and the trial court did not have the authority to terminate her rights under a repealed statute.

We affirm.

## Background

Adam was born at the end of March 2024. At the time, Mother was living with Adam's maternal grandmother (Grandmother), but Grandmother kicked her out of the home about a week later. DFPS received a report that Mother took Adam to see J.N., the man Mother believed to be Adam's father. While at J.N.'s house, Mother and J.N. got into an argument, and Mother called her boyfriend to pick her up. When her boyfriend arrived, J.N. shot him. Adam was with Mother and J.N. when the shooting occurred.

---

[2]    *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (O), (P).

[3]    The trial court also terminated the rights of Adam's unknown father. *See id.* § 161.002.

According to the report, J.N. appeared to be intoxicated and "was waving around the gun inside the residence prior to the shooting." Mother would later tell a DFPS investigator J.N. was "high off synthetic marijuana" during the incident and that "he takes pills off the street." After the shooting, J.N. was incarcerated. He told DFPS that he did not know if he was the father and declined to speak with DFPS further. J.N. submitted to a DNA test, which showed he was not the father.

At the investigator's initial meeting with Mother, DFPS recommended Mother for domestic violence services. Mother enrolled in late April but told the investigator that she could not participate because her phone was not working. A couple months later, Mother emailed DFPS reporting that she was participating in counseling.

Mother agreed to submit to random drug testing but did not appear for testing requested by DFPS three different times in July and August 2024.

In late August, the DFPS investigator requested a police welfare check on Adam and Mother because Mother was not answering her phone. A background check revealed that Mother had been arrested and incarcerated in June 2024 for possession of methamphetamine, and during the welfare check, she was arrested on an open warrant for bond forfeiture.

Mother had history with DFPS involving her two older children. The first report, made in April 2019, involved an allegation of physical abuse made after one

3

of Mother's older children was shot during a drive-by shooting and the other child had access to illegal drugs that Mother used. The DFPS investigation was unable to determine whether this report was true. Another report, made in January 2021, alleged neglectful supervision and that Mother lacked a stable home. The DFPS investigation concluded there was reason to believe this report was true. The older children no longer live with Mother.

According to the CASA report, Mother had a criminal history that included a conviction for possession of a controlled substance and aggravated assault with a deadly weapon and had pending criminal charges for theft and possession of a controlled substance.

In the home study of Grandmother, the DFPS investigator determined that Grandmother was not an appropriate caregiver because she had history with DFPS involving drug use and untreated mental health issues. The Mother's brother, who also lived in Grandmother's home, had criminal history involving drug possession charges. Based on DFPS's safety concerns with Grandmother being Adam's primary caregiver, the trial court ordered Adam's removal and placed him in DFPS's care.

After Adam's removal, the trial court ordered Mother to comply with the DFPS family service plan, which included: (1) maintaining a safe and stable home; (2) obtaining verifiable employment; (3) participating in parenting classes; (4) completing a psychological evaluation, substance abuse assessment, and

domestic violence assessment; (5) participating in random drug testing; (6) attending weekly NA meetings and participating in an outpatient program; and (7) attending all hearings, visits, and planning sessions involving Adam.

David Lee, DFPS conservatorship worker, testified about Mother's compliance with her family service plan. Mother did not provide a stable home. Lee learned the day of trial that Mother was staying with her new baby's father, whom Lee had not met.

Mother did not have verifiable employment, and she did not participate in parenting classes. Although she completed the psychological evaluation and substance abuse and domestic violence assessments, she did not follow the recommendations, which included individual therapy, random drug testing, substance abuse counseling, and domestic violence counseling. She did not participate in any individual therapy. She was unsuccessfully discharged from domestic violence counseling after she missed consecutive sessions. She attended substance abuse counseling on and off but did not complete it.

Lee recounted that although Mother submitted to some random drug tests, she tested positive throughout the pendency of the case and did not appear for multiple random drug tests. Mother used drugs during pregnancy with both Adam and the new baby.

Lee testified that Mother's visitations were suspended after she was observed feeding Adam whole grapes at a visit when he was seven months old, shortly after she tested positive for methamphetamines. After that visit, the trial court ruled that Mother would not be able to attend visits unless her drug levels dropped and she participated in substance abuse therapy.

Lee testified that Adam is in a stable home with his foster family and that he was meeting his developmental milestones and bonding with the other child in the home. He further testified that it was not in Adam's best interest to be returned to Mother because she had engaged in conduct harmful to Adam and continued to test positive for illegal substances during the case and while she was pregnant with her new baby.

CASA volunteer Melanie Beck confirmed that Adam was meeting his milestones. She testified that it was in Adam's best interest to stay with the family he had been living with because he was in a safe, drug-free environment.

Mother acknowledged that she tested positive for drugs while she was pregnant with her new child born during the pendency of this case, but she testified that the last time she used illicit drugs was eight months before trial and that her recent drug tests were negative. She admitted she was unsuccessfully discharged from domestic violence counseling because she missed three appointments. She explained that she had asked the service provider to text her because she didn't have

her email address, but the provider emailed her instead. On another occasion, she was "busy" and "couldn't make" the appointment. She also acknowledged she did not do the substance abuse counseling or individual therapy but explained that she missed the substance abuse classes because she had premature labor and was on bed rest. She testified that she wants to see Adam and would comply with the classes now.

Mother explained she was unemployed because after she gave birth to her new baby by C-section, she had to be on bed rest, but she planned to get a job when physically able. On cross-examination, though, Mother admitted that she did not have a job or stable home during the pendency of the case.

Mother further testified that she had been living with Grandmother but now lives with the father of her new baby at his grandmother's house and that a DFPS worker had been to the home. She testified that the father of the new baby is employed, and that he had to take a drug test and has two kids who do not live with him. She admitted that the father of the new baby has a criminal past but was not sure what it was, and she agreed that she has a pattern of getting involved with people with not very good backgrounds.

Mother testified she did not know who Adam's father was. In addition to Adam, she has two older children who did not live with her and her new baby who was still living with her.

The trial court found by clear and convincing evidence that Mother violated Texas Family Code section 161.001(b)(1) (D), (E), (O), and (P), and that termination of Mother's parental rights was in Adam's best interest. The trial court terminated Mother's rights and appointed DFPS as Adam's sole managing conservator.

## Sufficiency of the Evidence

In her first, second, fourth, fifth, and sixth issues, Mother asserts that the evidence is legally and factually insufficient to support the trial court's findings that she engaged in the predicate acts set forth in Family Code section 161.001(b)(1)(D), (E), (O), and (P) and that termination of her parental rights was in Adam's best interest. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (O), (P), (b)(2).

### A.    Standard of Review

The natural right existing between a parent and child is of constitutional dimensions, frequently characterized as far more precious than any property right. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Accordingly, a parent has a commanding interest in the accuracy and justice of the decision to terminate his or her parental status. *Santosky v. Kramer*, 455 U.S. 745, 759 (1982). Thus, we strictly scrutinize termination proceedings and construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20.

At the same time, a parent may forfeit his or her parental rights based on his actions or omissions. *In re J.D.G.*, 570 S.W.3d 839, 850 (Tex. App.—Houston [1st

Dist.] 2018, pet. denied). Parental rights are accorded only to natural parents who are fit to accept the accompanying responsibilities. *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). Though a natural parent faces losing his or her highly-protected parental rights in a termination proceeding, the State's primary focus is to protect the child's best interests. *Id.*

Because the burden of proof in termination proceedings is clear and convincing evidence, a heightened standard of review in an evidentiary challenge is required. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). Thus, under either legal sufficiency or factual sufficiency review, we determine whether the evidence is such that a trier of fact could have reasonably formed a firm belief or conviction that its finding was true. *Id.*; *In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022). The "distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *In re J.D.G.*, 570 S.W.3d at 850.

In determining whether the legal sufficiency of the evidence supports the trial court's termination of parental rights, "we look at all the evidence in the light most favorable to the finding, assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *In re J.W.*, 645 S.W.3d at 741 (internal quotations omitted). "However, we may not disregard undisputed facts that do not support the finding." *Id.* (internal quotations

omitted). In conducting a factual-sufficiency review in this context, the evidence is factually insufficient if, "in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

Under these standards, the factfinder remains "the sole arbiter of the witnesses' credibility and demeanor." *In re J.W.*, 645 S.W.3d at 741. In a bench trial, the trial court, as factfinder, weighs the evidence and resolves evidentiary inconsistencies and conflicts. *In re R.J.*, 579 S.W.3d 97, 117 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).

## B. Applicable Law

Family Code Section 161.001(b) authorizes an "involuntary termination of parental rights if a court finds by clear and convincing evidence both that a parent engaged in one or more enumerated predicate grounds for termination and that termination is in the best interest of the child." *In re M.P.*, 639 S.W.3d 700, 701–02 (Tex. 2022); *see* TEX. FAM. CODE § 161.001(b)(1)(A)–(U), (b)(2). Generally, "[o]nly one predicate ground and a best interest finding are necessary for termination, so 'a court need uphold only one termination ground—in addition to upholding a challenged best interest finding—even if the trial court based the termination on

more than one ground.'" *In re M.P.*, 639 S.W.3d at 702 (quoting *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019)).

Although only one predicate ground is necessary to support a judgment of termination, we may not bypass evidentiary challenges to subsections 161.001(b)(1)(D) and (E)—"the so-called endangerment grounds." *In re J.W.*, 645 S.W.3d at 748. "Those grounds bear special significance because termination of a parent's rights under either can serve as a ground for termination of his [or her] rights to *another* child." *Id.*; *see* TEX. FAM. CODE § 161.001(b)(1)(M).

Because prior termination for endangerment provides a sufficient basis for a future termination, due process and due course of law require us to detail our analysis if we affirm the termination under either subsection 161.001(b)(1)(D) or (E). *In re N.G.,* 577 S.W.3d at 237.

## C. Endangerment Findings

"'To endanger' means to expose a child to loss or injury or to jeopardize a child's emotional or physical health." *Jordan v. Dossey,* 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Though "endanger" means "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," the conduct does not need to be directed at the child, and the child does not need to suffer injury. *In re J.W.*, 645 S.W.3d at 748.

## 1. Section 161.001(b)(1)(D)

Family Code section 161.001(b)(1)(D) authorizes a trial court to order termination of a parent-child relationship if it finds by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional wellbeing of the child[.]" TEX. FAM. CODE § 161.001(b)(1)(D).

The endangerment analysis under subsection (D) focuses on the evidence of the child's physical environment but allows termination if DFPS proves the parent's conduct caused a child to be placed or remain in an "endangering environment." *Jordan*, 325 S.W.3d at 721.

The endangering "conditions or surroundings" include "[i]nappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in the home . . . ." *Id.* Subsection D allows termination based on a single act or omission. *Id.*

## 2. Section 161.001(b)(1)(E)

Family Code section 161.001(b)(1)(E) authorizes a trial court to order termination of a parent-child relationship if it finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]" TEX. FAM. CODE § 161.001(b)(1)(E). Under subsection (E), DFPS must

prove that the parent engaged in a voluntary, deliberate, and conscious course of conduct that endangered the child, rather than a single endangering act or omission, as permitted by subsection (D). *Jordan*, 325 S.W.3d at 723.

"A child is endangered if his environment creates a potential for danger that the parent disregards." *In re N.J.H.*, 575 S.W.3d 822, 831 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). Danger to the child's well-being may be inferred from parental misconduct standing alone, and endangering conduct need not be directed toward the child. *Id; In re J.F.-G.,* 627 S.W.3d 304, 312 (Tex. 2021). "Conduct that subjects a child to life of uncertainty and instability endangers the child's physical and emotional well-being." *Jordan*, 325 S.W.3d at 723.

"Intentional criminal activity that exposes a parent to incarceration is conduct that endangers the physical and emotional well-being of a child." *In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Although "mere imprisonment will not, standing alone, constitute engaging in conduct which endangers the emotional or physical well-being of a child," incarceration supports an endangerment finding "if the evidence, including the imprisonment, shows a course of conduct which has the effect of endangering the physical or emotional wellbeing of the child." *In re J.F.-G.*, 627 S.W.3d at 312–13 (quoting *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533–34 (Tex. 1987). Thus, a parent's criminal history—considering "the nature of the crimes, the duration of incarceration, and

whether a pattern of escalating, repeated convictions exists"—may support a finding of endangerment. *Id.* at 313.

"[E]ndangering conduct may include the parent's actions before the child's birth . . . including evidence of drug usage." *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). Endangerment does not require a parent's drug use to directly or physically harm the child or to be done in the child's presence. *See In re R.R.A.*, 687 S.W.3d 269, 278 (Tex. 2024); *In re N.J.H.*, 575 S.W.3d at 831. "[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *In re J.O.A.*, 283 S.W.3d at 345.

"A reviewing court should not evaluate drug-use evidence in isolation; rather, it should consider additional evidence that a factfinder could reasonably credit that demonstrates that illegal drug use presents a risk to the parent's 'ability to parent.'" *In re R.R.A.*, 687 S.W.3d at 278. Thus, a parent's "decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being." *In re N.J.H.*, 575 S.W.3d at 832. And "[a] parent's past endangering conduct may create an inference that the past conduct may recur and further jeopardize the child's present or future physical or emotional wellbeing." *In re J.D.G.*, 570 S.W.3d 839, 851 (Tex. App.—Houston [1st Dist.] 2018, pet. denied).

14

### 3.    Analysis

Mother argues that the evidence is insufficient to support termination under subsection (D) because DFPS must have determined there was no endangerment when DFPS allowed Adam to remain in her possession following the incident where J.N. shot Mother's boyfriend. Additionally, Mother contends that the positive hair tests for illegal drugs were insufficient to support the endangerment finding under subsection (E) because her urine tests were consistently negative.

DFPS responds that Mother cites no authority, and DFPS knows of none, showing parental conduct that does not create an immediate danger warranting emergency removal results in per se insufficient evidence to support endangerment findings under subsections (D) or (E), or that DFPS's determination not to remove a child at some point during an investigation constrains a trial court's review of the parent's conduct prior to removal. DFPS further responds that she offered no support for her contention that a clean urine sample would negate a hair sample showing drug use and that Mother failed to address all the other evidence supporting the trial court's endangerment findings.

The evidence before the trial court supports an inference that Mother's conduct endangered Adam's physical or emotional well-being. Parental conduct that

presents a substantial risk of harm to the child allows a factfinder to reasonably find endangerment. *See In re R.R.A.*, 687 S.W.3d at 278. "[A] parent's continued association with a known abuser is a conscious choice that endangers a child's physical and emotional wellbeing because it exposes the child to the possibility of violence." *In re D.D.D.*, No. 01-23-00078-CV, 2023 WL 4872399, at *11 (Tex. App.—Houston [1st Dist.] Aug. 1, 2023, no pet.) (mem. op.).

Mother knew that by taking Adam to see J.N. at two weeks old, she was exposing him to substantial risk of harm. *See In re R.R.A.*, 687 S.W.3d at 278. The evidence shows that J.N. had repeatedly engaged in violent criminal conduct directed at Mother, including a conviction for assault of a pregnant person. This assault took place while Mother was pregnant with Adam, yet Mother took Adam to J.N.'s residence only a few months later. Mother reported that J.N. was "high off synthetic marijuana" while she and Adam were at J.N.'s residence, and DFPS's investigation revealed that J.N. was waving a gun around inside the residence, got into an argument with Mother, and when Mother's boyfriend came to pick her up, J.N. shot him. Mother admitted at trial that J.N. "assaulted [Mother's boyfriend] with a deadly weapon right in front of [Adam]."

After J.N. was arrested and incarcerated following the shooting, DFPS did not immediately seek to remove the child from Mother but offered domestic violence counseling services and initiated a home study of Grandmother's home to determine

whether it would be safe for Adam to reside there. *See* TEX. FAM. CODE § 262.101(a)(6) (requiring DFPS to make "reasonable efforts, consistent with the circumstances and providing for the safety of the child, were made to prevent or eliminate the need for the removal of the child"). After failing to participate in drug testing three times, she was charged with possession of methamphetamines and arrested on an open warrant. *See In re B.S.*, No. 01-22-00826-CV, 2023 WL 3099904, at *8 (Tex. App.—Houston [1st Dist.] Apr. 27, 2023, no pet.) (mem. op.) (acknowledging that intentional criminal activity that exposes parent to incarceration is conduct that endangers child's physical and emotional well-being). Based on Mother's refusal to submit to drug testing, her arrest and incarceration for possession of methamphetamine, and her positive drug test shortly after removal, the trial court could have reasonably concluded that Mother was using illegal drugs before Adam was removed from her custody. *See In re L.D.*, No. 01-17-00471-CV, 2017 WL 6374663, at *7 (Tex. App.—Houston [1st Dist.] Dec. 14, 2017, pet. denied) (mem. op.) (holding that parent's refusal to submit to drug testing supported conclusion he was using drugs). DFPS's home study of Grandmother revealed Grandmother also had a history of drug use, her own history with DFPS, and untreated mental health concerns. And Mother's brother, who also lived in the home, had a history of drug possession charges.

Mother continued to test positive for illegal drugs repeatedly during the pendency of this case, from less than two weeks after removal to two months before trial commenced and did not participate in drug testing on several dates. *See In re A.M.*, 495 S.W.3d 573, 580 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (explaining that "a parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being"). Although Mother had a recent negative drug test, her history of illegal drug use, including during pregnancy, supports an inference of endangerment. *See Interest of J.F.-G.*, 627 S.W.3d 304, 317 (Tex. 2021).

Despite recent developments showing possible progress by Mother, the trial court could have reasonably determined any evidence of improvement was short-lived and outweighed by the extent of her prior drug use and her exposure of Adam to dangerous circumstances. *See Jordan*, 325 S.W.3d at 726; *In re J.O.A.* 283 S.W.3d at 346 (deferring to trial court to weigh evidence of significant recent improvements, especially of short duration, against probative value of irresponsible choices).

Viewing all the evidence in a light most favorable to the trial court's finding, and considering any undisputed evidence to the contrary, we conclude that a factfinder reasonably could have formed a firm belief or conviction that Mother

engaged in a course of conduct that endangered Adam's physical and emotional well-being. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E).

Further, considering the entire record, including evidence both supporting and contradicting the finding, a factfinder reasonably could have formed a firm belief or conviction that Mother engaged in a course of conduct that endangered Adam's physical and emotional well-being. *See id.* Thus, we hold that the evidence is legally and factually sufficient to support these predicate findings supporting termination of Mother's parental rights. We need not address the trial court's remaining predicate findings. *See In re M.P.*, 639 S.W.3d at 702.

We overrule Mother's first and second issues.

**D.    Best Interest**

Mother also contends that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in Adam's best interest.

The best interest prong focuses on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). Several nonexclusive factors guide the factfinder's best-interest determination, including: (1) the child's emotional and physical needs; (2) present and future physical and emotional danger to the child; (3) the parental abilities of the individuals seeking custody; (4) those individuals' plans for the child and the stability of the home; (5) the plans for the

child by the agency seeking custody and the stability of the proposed placement; (6) the parent's acts or omissions that may suggest the existing parent–child relationship is improper; and (7) any excuse for the parent's acts or omissions. *Id.* (the "*Holley* factors," citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). We may also consider the statutory factors set forth in Family Code section 263.307. *See* TEX. FAM. CODE § 263.307; *In re A.C.*, 560 S.W.3d at 631 n.29. Proof of each of these considerations is not a condition precedent to termination. *In re C.H.*, 89 S.W.3d at 27. The analysis may include direct and circumstantial evidence, the totality of the evidence, and subjective factors. *In re J.M.T.,* 519 S.W.3d 258, 269 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). Here, several factors support the trial court's finding that termination of Mother's parental rights is in Adam's best interest.

The evidence that Mother knowingly exposed Adam to a violent drug user who assaulted her while she was pregnant with Adam supports the trial court's best interest finding. The factfinder may infer physical and emotional danger to Adam now and in the future from the evidence that Mother exposed him to domestic violence. *See In re R.J.*, 579 S.W.3d at 116–17; TEX. FAM. CODE § 263.307(b)(7), (12)(E).

At the time of trial, Adam was about 16 months old. When a child is too young to express his desires, the factfinder may consider that the child has bonded with the

foster family, that the foster family has taken good care of him, and that the child has spent minimal time with a parent. *In re N.J.H.*, 575 S.W.3d at 834. About four months after birth, Adam was placed with the foster family and has been cared for by them ever since. Adam's child advocate described him as a very happy baby who is meeting all his milestones and in a safe, drug-free environment. Mother has not seen Adam since her visits were suspended by the trial court following her positive result for methamphetamine. Three months later, she had another positive drug test and was unable to have her visits reinstated.

Evidence of Mother's past pattern of drug use, including through two pregnancies and during the pendency of the case, is relevant, not only to her parenting abilities and the stability of the home she would provide, but also to Adam's emotional and physical needs, now and in the future, and to the emotional and physical danger to Adam, now and in the future. *See In re N.J.H.*, 575 S.W.3d at 834; *see also* TEX. FAM. CODE § 263.307(b)(8). "A factfinder may afford great weight to the significant factor of drug-related conduct." *In re N.J.H.*, 575 S.W.3d at 834.

Although Mother's drug test was negative in June, such a recent improvement does not negate her history of drug use. *See In re J.O.A.*, 283 S.W.3d at 346. Continued drug use through the pendency of the case also indicates an inability or unwillingness to prioritize the burdens and responsibilities of parenthood ahead of

21

the desire for intoxication, an impaired condition that is not compatible with the care of a young child like Adam. *See In re A.J.D.-J.*, 667 S.W.3d 813, 825 (Tex. App.—Houston [1st Dist.] 2023, no pet.).

Further, the evidence showing that Mother failed to complete court-ordered programs and services supports the trial court's best interest finding. A parent's failure to take the initiative to complete the services required to regain possession the child supports an inference that such parent does not have the ability to motivate herself to seek out available resources needed now or in the future. *In re J.M.T.*, 519 S.W.3d at 270.

At trial, Mother acknowledged that she did not have employment and had recently moved in with her new baby's father, who has a criminal record. Although she testified that she put in applications for her own apartment and planned to look for a job, there was no evidence that she would be able to obtain an apartment or employment. The trial court may infer from her lack of income and stable housing that she is unable to provide for a child's emotional and physical needs. *See id.*

In contrast, both the DFPS caseworker and CASA advocate testified that the foster parents provide a stable home for Adam, that Adam has bonded with the foster family, and that Adam is thriving in the foster placement. They both opined that it was in Adam's best interest for him to remain in his foster placement.

We defer to the trial court's assessment of the witness's credibility and demeanor in crediting this testimony as evidence in favor of the trial court's best-interest finding. *See In re J.F.-G.*, 627 S.W.3d at 312. "[I]n a bench trial, the judge as the trier of fact weighs the evidence, assesses the credibility of witnesses and resolves conflicts and inconsistencies." *In re R.J.,* 579 S.W.3d at 117.

Viewing all the evidence in a light most favorable to the trial court's best-interest finding, and considering any undisputed evidence to the contrary, we conclude that a reasonable factfinder could have formed a firm belief or conviction that a termination of Mother's parental rights is in Adam's best interest. *See In re J.W.*, 645 S.W.3d at 741.

Further, considering the entire record, including evidence both supporting and contradicting the trial court's finding, a factfinder reasonably could have formed a firm belief or conviction that a termination of Mother's parental rights is in Adam's best interest. *See In re C.H.*, 89 S.W.3d at 25–26.

For these reasons, we hold that the evidence is legally and factually sufficient to support the trial court's best-interest finding. *See In re A.C.*, 560 S.W.3d at 630–32.

We overrule Mother's sixth issue.

## Conclusion

We affirm the trial court's decree terminating the parent-child relationship between Mother and Adam.

Clint Morgan
Justice

Panel consists of Justices Rivas-Molloy, Guiney, and Morgan.