

# NUMBER 13-21-00410-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI − EDINBURG

## IN THE INTEREST OF G.L. A/K/A A.L. A/K/A A.L.G.L., A CHILD

### On appeal from the County Court at Law
### of Aransas County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Tijerina**
**Memorandum Opinion by Justice Benavides**

The trial court terminated the parental rights of Mother and Father to their daughter, G.L. a/k/a A.L. a/k/a A.L.G.L.[1] Only Father appeals. By a single multifarious issue, Father contends that his due process rights were violated because the Texas Department of Family and Protective Services (Department) and the trial court failed to follow various

---

[1] To protect the identity of minor children, we utilize aliases for the children and related parties. *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

procedures required by the Texas Family Code that involve implementation of the family service plan. We affirm.

## I.   BACKGROUND

G.L. was born on November 21, 2020, suffering from methamphetamine and heroin withdrawal. Mother, who had a prior history with the Department, admitted to drug use throughout her pregnancy and subsequently relinquished her parental rights.

Father was in custody at the Aransas County jail at the time of G.L.'s birth. In December 2020, he was transferred to the Bexar County jail, where he remained until his release in March 2021.

Unable to find a family placement or qualified person to serve as a safety monitor for Mother, the Department filed an emergency motion for temporary conservatorship of the child and petition to terminate the parental rights of Mother and Father on December 4, 2020. Father was served with the petition while in custody at the Aransas County jail. The petition includes a conditional request to terminate Father's parental rights if, among other reasons, he fails "to comply with the provisions of a court order that specifically establishe[s] the actions necessary for [Father] to obtain the return of the child."

The trial court appointed an attorney ad litem to represent Father at the adversary hearing and throughout the proceedings. Father did not appear at the adversary hearing because he was in transit between the Aransas County jail and Bexar County jail. After the hearing, the trial court appointed the Department temporary managing conservator and approved G.L.'s placement with a foster family.

Prior to the status hearing on January 27, 2021, the Department filed a "Status

2

Report to the Court." The status report included a detailed proposal for the family plan of service. Specifically, the Department proposed that Father be ordered to submit to random drug screening; participate in drug counseling, individual counseling, and parenting courses; comply with a visitation plan; cooperate with the assigned caseworker; and demonstrate a safe home environment for the child.

After the status hearing, the court signed a "Status Hearing Order" finding that Father had not reviewed the proposed family service plan; that he did not understand it; and that he had not been advised that unless he was "willing and able to provide the child with a safe environment, even with the assistance of a service plan, within the reasonable period of time specified in the plan," his parental and custodial duties and rights could be "subject to restriction or to termination" or the child might not "be returned to him." The proposed family service plan was "incorporated" into the status hearing order "by reference as if the same were copied verbatim" in the order and expressly made an order of the court. Also, due to his detention in the Bexar County jail, the trial court did not order visitation for Father at that time.

A permanency hearing was conducted on September 1, 2021, and the termination trial was held on October 27, 2021. Caseworker Jordan Pratt testified on behalf of the Department. He acknowledged that he developed the service plan without Father's input, that no one from the Department met with Father in person during the case, that neither he nor anyone from the Department provided Father with a copy of the plan, and that he did not request a courtesy caseworker for Father while he was in Bexar County.

Pratt said that when Father was released from the Bexar County jail in March 2021,

3

Father returned to Aransas County and told Pratt he was living in a hotel but intended to return to Bexar County soon. Pratt testified that during this period, he "notified" Father about the plan and "discussed it with him" "multiple times" over the phone. Pratt also said that he "attempt[ed]" to meet with Father in person but offered no details on why the meeting did not occur. Around this time, Father told Pratt to only communicate with him through his attorney: "[O]n March 18, [Father] notified me that he no longer wanted to communicate with me. That if I need to communicate with him, I need to speak with his attorney."

According to Pratt, Father "never cooperated with the Department" and "never participated" in a single task assigned to him under the service plan. Pratt said he arranged "multiple drug screens" for Father while he was residing in Aransas County, but Father never appeared. In his opinion, Father was solely to blame for his noncompliance.

Father, who was detained in the Aransas County jail at the time of trial for undisclosed reasons, was the only witness who testified on his behalf. Father said that he was previously "incarcerated" in the Aransas County jail at the time of G.L.'s birth on a motion to revoke his probation in Aransas County and that one of the associated charges against him was possession of a controlled substance in Penalty Group 1. He acknowledged that he was also on probation in Bexar County and expected to be returned to the Bexar County jail in the future because the State had filed a motion to revoke his probation.

When asked whether he completed any of the tasks that he was ordered to perform, Father responded, "I previously have taken substance abuse classes as well as

4

parenting classes in the past due to me going to foster case. I have all those classes in my background." As far as drug testing, Father said that Pratt only asked him once. He explained that he was unable to comply because he was living and working in San Antonio at the time, and Pratt had arranged for the screening to occur in Aransas County. Father acknowledged that he told Pratt to only communicate with him through his attorney but explained that he was upset with Pratt for not allowing him to visit G.L.

Father did not object to G.L.'s placement with a foster family but asked the court not to terminate his parental rights. The trial court terminated his rights based on constructive abandonment and failure to comply with a court order. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(N), (O). The trial court also found that termination of Father's parental rights was in G.L.'s best interests. *See id.* § 161.001(b)(2). This appeal ensued.

## II. APPLICABLE LAW

### A. Due Process

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. At a minimum, due process "requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner." *Mosely v. Tex. Health & Hum. Servs. Comm'n*, 593 S.W.3d 250, 265 (Tex. 2019) (quoting *Univ. of Tex. Med. Sch. at Hous. v. Than*, 901 S.W.2d 926, 930 (Tex. 1995)).

"When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures." *Santosky v. Kramer*, 455 U.S. 745, 753–54 (1982). In the context of parental termination, courts determine the contours of due

5

process by balancing three distinct factors: "the private interests affected by the proceeding; the risk of error created by the State's chosen procedure; and the countervailing governmental interest supporting use of the challenged procedure." *In re J.F.C.*, 96 S.W.3d 256, 273 (Tex. 2002) (quoting *Santosky*, 455 U.S. at 754). Of course, the private interest at stake in a parental termination case—the right of a parent to raise his or her child—is a "fundamental liberty interest" that is "far more precious than any property right." *Id.* (quoting *Santosky*, 455 U.S. at 758–59).

## B.      Service Plans

Once the Department is appointed temporary managing conservator of a child, the Department is required to develop a service plan that effectively serves as a road map for parents to avoid termination. *See* TEX. FAM. CODE ANN. §§ 263.101, 263.102(a); *In re N.G.*, 577 S.W.3d 230, 238 (Tex. 2019) (describing the service plan as "a mandate or directive that establishes some steps or actions necessary for the parent to obtain return of the child who is in the Department's custody"); *In re E.C.R.*, 402 S.W.3d 239, 240 (Tex. 2013) (describing the service plan as "a court order that specifie[s] what [the parent] ha[s] to do to get [their] child back"). The paramount goal of a service plan is to ensure that a parent can provide their child with a safe environment. *See* TEX. FAM. CODE ANN. § 263.102(b).

The Department and parent should develop the service plan jointly, but the Department may construct the plan without the parent's participation if it determines that the parent is unable or unwilling to do so. *Id.* § 263.103(a), (c). Among other requirements, the Department must reduce the plan to writing and use plain language "that is clear and

6

understandable to the parent." *Id.* § 263.102(a)(2), (d). The Department is required to provide the parent with a copy of the plan, which must include the following statutory warning:

> TO THE PARENT: THIS IS A VERY IMPORTANT DOCUMENT. ITS PURPOSE IS TO HELP YOU PROVIDE YOUR CHILD WITH A SAFE ENVIRONMENT WITHIN THE REASONABLE PERIOD SPECIFIED IN THE PLAN. IF YOU ARE UNWILLING OR UNABLE TO PROVIDE YOUR CHILD WITH A SAFE ENVIRONMENT, YOUR PARENTAL AND CUSTODIAL RIGHTS MAY BE RESTRICTED OR TERMINATED OR YOUR CHILD MAY NOT BE RETURNED TO YOU. THERE WILL BE A COURT HEARING AT WHICH A JUDGE WILL REVIEW THE SERVICE PLAN.

*Id.* §§ 263.102(b), 263.103(b).

The Department must file the plan with the trial court within forty-five days of being appointed temporary managing conservator. *Id.* § 263.101. The trial court is generally required to conduct a status hearing where it reviews the plan "for reasonableness, accuracy, and compliance with requirements of court orders." *Id.* §§ 263.201(a), 263.202(b). The trial court must make specific findings, including whether the "parents have reviewed and understand the plan." *Id.* § 263.202(b)(2). "After reviewing the service plan and making any necessary modifications, the court shall incorporate the service plan into the orders of the court and may render additional appropriate orders to implement or require compliance with the plan." *Id.* § 263.202(b–1). Finally, the Department is required to designate an employee who is responsible for facilitating a parent's compliance with the plan. *Id.* § 263.005.

## C.    Termination Under § 161.001(b)(1)(O)

Failure to comply with the service plan is grounds for termination. *See id.*

7

§ 161.001(b)(1)(O). Substantial compliance is inadequate; a parent must comply with each requirement of the service plan to avoid termination under subsection O. *In re J.M.T.*, 519 S.W.3d 258, 267 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (collecting cases). However, termination under subsection O is not appropriate if a parent proves by a preponderance of the evidence that: "(1) the parent was unable to comply with specific provisions of the court order; and (2) the parent made a good faith effort to comply with the order and the failure to comply with the order is not attributable to any fault of the parent." TEX. FAM. CODE ANN. § 161.001(d).

### III.    WAIVER & HARMLESS ERROR

As a preliminary matter, the Department argues that Father failed to raise a due process objection at any point in the proceedings, and therefore, the issue has been waived on appeal. *See* TEX. R. APP. P. 33.1(a)(1). "[A] party sufficiently preserves an issue for review by arguing the issue's substance, even if the party does not call the issue by name." *St. John Missionary Baptist Church v. Flakes*, 595 S.W.3d 211, 214 (Tex. 2020). During trial, Father squarely raised the issue of whether he received notice of the service plan. Because notice is a hallmark of due process, we conclude that Father's due process issue was preserved. *See id.*; *Mosely*, 593 S.W.3d at 265.

The Department also argues that even if Father preserved the error, he has not expressly challenged the sufficiency of the evidence on each of the two termination grounds, thereby rendering any alleged error harmless. Again, we disagree.

"Courts must broadly construe issues to reach all core and substantive questions such that the merits of an appeal are addressed when reasonably possible to provide the

8

party with a meaningful appeal." *In re Z.M.M.*, 577 S.W.3d 541, 542–43 (Tex. 2019) (per curiam) (citing *Ditta v. Conte*, 298 S.W.3d 187, 189–90 (Tex. 2009)). Here, the gist of Father's argument is that the trial court and Department deprived him of a meaningful opportunity to complete the service plan. If true, that would undermine the trial court's termination finding under subsection O. *See* TEX. FAM. CODE ANN. § 161.001(d). Likewise, Father's argument implicates the trial court's termination finding under subsection N that "the Department has made reasonable efforts to return the child to [Father]." *See id.* § 161.001(b)(1)(N) (providing that the court may terminate parental rights upon clear and convincing evidence that the parent "constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the [Department] for not less than six months, and: (i) the department has made reasonable efforts to return the child to the parent; (ii) the parent has not regularly visited or maintained significant contact with the child; and (iii) the parent has demonstrated an inability to provide the child with a safe environment"); *In re F.E.N.*, 542 S.W.3d 752, 766–67 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) (noting that, although other evidence may also satisfy the first element of subsection N, "implementation of a family service plan by the Department is generally considered a reasonable effort to return a child to the parent"). Thus, rather than "concede" the termination findings, as the Department suggests, Father indirectly attacked them with his due process argument.

Moreover, other than the Department's failure to provide Father with a copy of the service plan, Father's actual notice of the service plan and his ability to comply with it were disputed at trial. Indeed, in accordance with § 161.001(d), the trial court made

specific findings on these factual issues:

> [Father] did not prove by a preponderance of evidence that [he]: (1) was unable to comply with specific provisions of a court order; and (2) the parent made a good faith effort to comply with the order and the failure to comply with the order is not attributable to any fault of the parent.

*See* TEX. FAM. CODE ANN. § 161.001(d). Because there is a significant tension between these findings and Father's due process argument, Father's appeal necessarily turns on the validity of these findings. Accordingly, we construe Father's issue on appeal to also include a challenge to the trial court's findings under § 161.001(d). *See In re Z.M.M.*, 577 S.W.3d at 542–43 (reversing and remanding to the court of appeals for reconsideration of termination grounds under § 161.001(b)(1)(O) because the court of appeals failed to recognize that Father's argument implicitly challenged the trial court's findings under § 161.001(d)).

## IV.   ANALYSIS

Father complains that both the trial court and the Department failed to comply with various provisions of Chapter 263 "that are designed to protect an individual's rights in a parental termination case." We address each in turn.

### A.   The Trial Court

Father contends that because the Department filed the service plan approximately two months after the status hearing, it was "impossible" for the trial court to comply with its statutory duty to confirm that the plan was reasonable before adopting it as an order of the court. *See* TEX. FAM. CODE ANN. § 263.202(b). Father argues that this alleged lack of oversight violated his due process rights and harmed him because the plan was not

10

tailored to his circumstances as an inmate.[2] *See id.* § 263.202(b)(3) (requiring the trial court to make a finding whether "the plan is reasonably tailored to address any specific issues identified by the [D]epartment").

To begin, this sub-issue has been waived. At trial, Father placed a spotlight on the Department's efforts to implement the plan, but he never suggested that the trial court erred in approving the plan. Even if he had, the objection would have been untimely. *See* TEX. R. APP. P. 33.1(a)(1). The appropriate time to object was at the status hearing nine months earlier when the trial court had the opportunity to "mak[e] any necessary modifications" before adopting the plan as an order of the court. *See* TEX. FAM. CODE ANN. § 263.202(b–1). Father has not provided us with a reporter's record from the status hearing, and the clerk's record does not contain any written objection to the service plan. *See Christiansen v. Prezelski*, 782 S.W.2d 842, 843 (Tex. 1990) (explaining that it is the appellant's burden to bring forward an appellate record showing reversible error).

Regardless, Father's argument has no merit. Father fails to acknowledge that, on January 22, 2021, five days prior to the status hearing, the Department filed its "Status Report to the Court," which made specific and detailed recommendations for the services and orders needed for Father. The status report also noted that Father "is incarcerated in the Bexar [C]ounty jail," and as a result, he "did not participate in the Family Strength and Needs assessment and missed [the] scheduled Family Group Conference." Finally, the status report requested that the trial court "make the service plan . . . an order of the [c]ourt."

---

[2] As we discuss below, Father was released from jail approximately seven months prior to the trial.

11

In its "Status Hearing Order," the trial court made a specific finding that it had reviewed Father's proposed service plan and found it to be "reasonable, accurate, and in compliance with the previous orders of the [c]ourt." *See* TEX. FAM. CODE ANN. § 263.202(b). The order also contains all the necessary findings required under the family code. *See id.* § 263.202(b)(1)–(4). Finally, the order states that Father's proposed service plan "is APPROVED and made an ORDER of this [c]ourt."

Approximately two months after the hearing and six days after the trial court signed its order, the Department filed the "Family Plan." The service requirements in the "Family Plan" are copied verbatim from those proposed in the status report. Thus, having reviewed the plan's substance—if not its final form—before adopting it as an order of the court, the trial court satisfied its duty under the family code. *See id.* § 263.202(b). Moreover, without a record of the status hearing, we presume the evidence presented at the hearing supports the trial court's order. *See Bennett v. Cochran*, 96 S.W.3d 227, 230 (Tex. 2002) (per curiam) (explaining that, absent a complete record on appeal, a court of appeals must presume the omitted items supported the trial court's judgment). Contrary to Father's suggestion, the trial court did not violate Father's due process rights.

## B.    The Department

Father argues that the Department: (1) made no effort to develop the service plan jointly, despite knowing his location in the Aransas County jail and then the Bexar County jail; (2) failed to tailor the plan to the limitations of his detention; (3) failed to provide him with a copy of the plan; (4) failed to request courtesy supervision while he was in Bexar County; and (5) generally neglected its responsibility to assist him in complying with the

12

plan's requirements, all of which collectively denied him a meaningful opportunity to comply with the plan. While we agree that the Department did not always follow the family code or its own guidelines in this case, we ultimately conclude that the record is sufficient to support the trial court's finding that Father did not establish that he was unable to comply with the plan or that his failure to comply was not his fault. *See* TEX. FAM. CODE ANN. § 161.001(d).

### 1. Joint Development

The family code generally requires the Department to collaborate with the parent on developing the service plan. *Id.* § 263.201(a). The family code also recognizes that a parent may be unable or unwilling to participate in the development of the plan. *See id.* When this exception applies, the trial court may approve the plan without the parent's involvement. *Id.* § 263.201(d)(2).

Here, Father's service plan was developed without him, and the only explanation offered by the Department was Father's status as an inmate in the Bexar County jail. This explanation, however, is inconsistent with the Department's internal guidelines, which require case workers to involve incarcerated parents in case planning. TEX. DEP'T OF FAM. & PROTECTIVE SERVS., *Incarcerated Parents Resource Guide*, 3 (Mar. 2019) https://www.dfps.state.tx.us/handbooks/CPS/Resource_Guides/Incarcerated_Parents_ Resource_Guide.pdf ("Just like parents who are not in a locked facility, incarcerated parents must be involved in case planning and receive a copy of their child's and their own plan of service, as well as receive updates about the case on a regular basis."). Moreover, Father's location in Bexar County, as opposed to Aransas County, was not a

valid reason for the Department not to involve Father. According to the same guidelines, the Department should have arranged a face-to-face meeting between Father and one of its caseworkers in Bexar County or, at the very least, "obtain[ed] input from [Father] via mail." *See id.* at 4. None of these things happened.

Nevertheless, Father failed to demonstrate how his lack of participation in the development of the plan harmed him. Father suggests on appeal that the terms of the plan were not specifically tailored to his needs or limitations as an inmate. *See* TEX. FAM. CODE ANN. § 263.202(3). Although Father describes his plan as "boilerplate," he does not explain how any of the requirements were inappropriate under the circumstances of the case. The child was born suffering from heroin and methamphetamine withdrawal while Father was jailed on a pending charge of possession of a controlled substance in Penalty Group 1, which includes heroin and methamphetamine. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.102(2), (6). Requiring Father to submit to random drug screens and complete drug counseling, individual counseling, and parenting classes were all suitable measures to ensure Father could provide a safe home environment for the child. *See* TEX. FAM. CODE ANN. § 263.202(3). And whatever limitations Father may have initially faced while in custody, it is undisputed that he was released in March 2021, giving him more than seven months to freely complete the service plan.[3] Therefore, the Department's development of the service plan without Father's input had little to no effect on the outcome of the case. *See* TEX. R. APP. P. 44.1(a)(1).

---

[3] There is no record of Father asking for the service plan to be amended to remove unnecessary services or include more appropriate ones. *See* TEX. FAM. CODE ANN. § 263.104.

14

## 2. Notice

Contrary to the family code and the Department's guidelines, Pratt testified that he never provided Father with a copy of the service plan, and as far as he knew, Father had never seen it.[4] *See id.* § 263.103(b); TEX. DEP'T OF FAM. & PROTECTIVE SERVS., *supra*, at 3. We are troubled by this lack of written notice. The written plan contains an important statutory warning and provides parents with a ready reference for complying with the details of the plan. *See* TEX. FAM. CODE ANN. § 263.102(b), (d).

Nonetheless, the record supports the trial court's implied finding that Father received actual notice of the plan. *See United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 272 (2010) (noting that actual notice "more than satisfies" due process rights); *Pierce v. Tex. Racing Comm'n*, 212 S.W.3d 745, 758 (Tex. App.—Austin 2006, pet. denied) ("[E]vidence that a party received actual notice of a hearing may defeat the party's claims on appeal for due process violations."). Pratt testified that upon Father's release, he "notified" Father about the service plan and "discussed it with him" "multiple times"

---

[4] We note that Father's attorney ad litem also had an affirmative duty to provide Father with a copy of the service plan. An attorney ad litem appointed to represent a parent has a duty "to ensure competent representation at hearings." TEX. FAM. CODE ANN. § 107.0131(a)(1)(C). This duty includes obtaining and reviewing "copies of all court files in the suit during the attorney ad litem's course of representation." *Id.* § 107.0131(a)(1)(C)(i). An attorney ad litem also has a duty to "become familiar with the American Bar Association's standards of practice for attorneys who represent parents in abuse and neglect cases." *Id.* § 107.0131(a)(1)(I). Among other things, the ABA's standards require, as a basic obligation, that a parent's attorney shall "[p]rovide the client with copies of all petitions, court orders, service plans, and other relevant case documents, including reports regarding the child except when expressly prohibited by law, rule or court order." AM. BAR ASS'N, *Standards of Practice for Attorneys Representing Parents in Abuse and Neglect Cases* 4 (2006), https://www.americanbar.org/content/dam/aba/administrative/child_law/aba-parent-rep-stds.pdf; Tex. Disciplinary Rules of Prof'l Conduct R. 1.03 (lawyer's duty of communication with a client).

At trial, Pratt admitted that he did not provide Father with a copy of the plan, but no one asked Father whether he received a copy from some other source, such as his attorney. Father does not contend on appeal that his trial counsel was ineffective.

over the phone. Pratt also testified that he arranged "multiple drug screens" for Father, but Father failed to submit himself for testing.

Father confirmed that he spoke to Pratt over the phone "a couple" of times. Father further testified that he had "a couple conversations" with Mother about "the circumstances" of the case. Father also acknowledged that Pratt arranged at least one drug screen for him, even if he disputed his ability to appear because of the test location. At no point in the trial did Father testify that he (1) was unaware of the contents of the plan or (2) did not appreciate the significance of failing to comply. Viewing this evidence with due deference to the factfinder's credibility determinations, we conclude that Father did not prove by a preponderance of the evidence that a lack of written notice prevented him from complying with the plan. *See* TEX. FAM. CODE ANN. § 161.001(d)(1); *In re J.F.C.*, 96 S.W.3d at 265–66 (explaining standard of review for legal and factual sufficiency in termination cases). In other words, having received actual notice, Father has not demonstrated that a lack of written notice amounted to a constitutional due process violation. *See Espinosa*, 559 U.S. at 272; *Pierce*, 212 S.W.3d at 758.

### 3. Support

Finally, Father suggests that the Department's general lack of support, including not assigning a courtesy caseworker in Bexar County, hindered his ability to comply with the plan. The Department assigns a caseworker to each case who must, among other obligations, help parents comply with the plan. *See* TEX. FAM. CODE ANN. § 263.005.

At trial the following facts were undisputed: (1) upon his release from the Bexar County jail in March 2021, Father returned to Aransas County, where he briefly resided

16

at a hotel; (2) Father then informed Pratt that he intended to move back to Bexar County; and (3) around the same time, Father terminated all direct communication with Pratt, telling Pratt to only contact him through his attorney. There is no evidence in the record about whether Pratt continued to monitor Father's progress through Father's attorney. Regardless, it was Father's decision to limit the Department's ability to directly support his compliance with the plan. *See id.* § 161.001(d)(2) (requiring parent to prove that "the failure to comply with the order is not attributable to any fault of the parent").

Most importantly, though, there is no evidence in the record that Father made a good faith effort to comply with the plan. *See id.* It was undisputed that Father "never participated" in a single task assigned to him under the service plan; in the seven months after he was released from the Bexar County jail and given actual notice of the plan, he never submitted himself for a drug screen, never scheduled an appointment for substance abuse counseling, never participated in individual counseling, and never attended a parenting course.

At trial, Father did not testify about what occurred after he ceased communication with Pratt. We can infer from the record that at some point, Father was rearrested in Aransas County. Otherwise, the seven months between Father's release from the Bexar County jail and trial were largely unaccounted for. Thus, the trial court did not err when it found that Father failed to prove by a preponderance of the evidence that he should be excused from his failure to comply with the plan. *See id.*

In sum, while we agree that the Department should make every reasonable effort to comply with the procedural safeguards provided for in the family code, based on the

17

record before us, we cannot say that Father was denied a meaningful opportunity to complete the service plan. Having affirmed the termination of his parental rights under subsection O, we do not reach the termination grounds under subsection N. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (holding that a single predicate finding under § 161.001(b)(1) is sufficient to support a judgment of termination when there is also a finding that termination is in the child's best interest); TEX. R. APP. P. 47.1.

## V.     CONCLUSION

We affirm the trial court's judgment.

GINA M. BENAVIDES
Justice

Delivered and filed on the
10th day of March, 2022.

18