

**IN THE
TENTH COURT OF APPEALS**

_____

**No. 10-24-00215-CV**

**IN THE INTEREST OF C.M., K.N., AND R.M., CHILDREN**

_____

**From the 82nd District Court
Robertson County, Texas
Trial Court No. 23-04-21644-CV**

**MEMORANDUM  OPINION**

Following a bench trial, the parental rights of C.M. (Father) and J.H. (Mother) were terminated.  The trial court found by clear and convincing evidence that both Father and Mother had violated Family Code subsections 161.001(b)(1)(D), (E), and (O) and that termination was in the children's best interest.  *See* TEX. FAM. CODE ANN. § 161.001(b).  Father and Mother appealed.  We will affirm.

**Sufficiency of the Evidence**

We begin with Father's and Mother's third, fourth, fifth, sixth, seventh, and eighth issues.  In these issues, Father and Mother contend that the evidence was legally and factually insufficient to support the trial court's termination findings.

The standards of review for legal and factual sufficiency of the evidence in cases involving the termination of parental rights are well established and will not be repeated here. *See In re J.F.C.*, 96 S.W.3d 256, 264–68 (Tex. 2002) (legal sufficiency); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002) (factual sufficiency). The trial court, as factfinder, is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

FINDINGS OF FACT AND CONCLUSIONS OF LAW

In their third and fourth issues, Father and Mother contend that the evidence is legally and factually insufficient to support the trial court's findings of fact, which are then insufficient to support the trial court's conclusions of law.

First, Father and Mother argue that the evidence is insufficient to support several of the trial court's findings because there was no written family service plan for Father or Mother contained within the appellate record of this case. However, after Father and Mother filed their appellants' brief in this appeal, the Department of Family and Protective Services (DFPS) filed a motion to supplement the clerk's record with the written family service plans for Father and Mother, asserting that the service plans had simply been omitted from the clerk's record in this appeal. On January 8, 2025, we ordered the trial court clerk to prepare, certify, and file in this Court a supplemental clerk's record containing the written family service plans for Father and Mother. *See* TEX. R. APP. P. 34.5(c)(1). On January 10, 2025, the trial court clerk filed a supplemental clerk's record containing the written family service plans showing that the service plans had been filed with the trial court clerk on June 5, 2023. A supplemental clerk's record is part

of the appellate record. *Id.* R. 34.5(c)(3). Thus, the appellate record now contains the written family service plans for Father and Mother.

Second, Father and Mother argue that the trial court's findings of fact and conclusions of law were not sufficiently specific. Father and Mother point to the fact that many of the trial court's findings of fact and conclusions of law do not specifically reference a certain child or children and instead generically reference "the child" or "the children."

After a trial court files original findings of fact and conclusions of law, any party may timely request that the trial court make specified additional or amended findings or conclusions. TEX. R. CIV. P. 298. When a party fails to timely request additional or amended findings of fact and conclusions of law, the party is deemed to have waived the right to complain on appeal of the trial court's failure to enter additional or amended findings. *Briargrove Park Prop. Owners, Inc. v. Riner*, 867 S.W.2d 58, 62 (Tex. App.—Texarkana 1993, writ denied); *see Barton v. Barton*, 584 S.W.3d 147, 155 (Tex. App.—El Paso 2018, no pet.). Nothing in the record indicates that Father or Mother requested additional or amended findings of fact and conclusions of law in this case; therefore, Father and Mother have waived any complaints about the inadequacy or incompleteness of the findings and conclusions. *See Briargrove Park Prop. Owners, Inc.*, 867 S.W.2d at 62.

For these reasons, we overrule Father's and Mother's third and fourth issues.

PREDICATE VIOLATIONS

In their fifth and sixth issues, Father and Mother contend that the evidence was legally and factually insufficient to support the trial court's findings that they violated

Family Code subsections 161.001(b)(1)(D), (E), and (O). We begin with Father's and Mother's argument that the evidence was legally and factually insufficient to support the trial court's findings that they violated subsection (E).

Termination under subsection (E) requires clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). To "endanger" means to expose the child to loss or injury, to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). The relevant inquiry under subsection (E) is whether sufficient evidence exists that the endangerment of the child's well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re E.M.*, 494 S.W.3d 209, 222 (Tex. App.—Waco 2015, pet. denied).

Scienter is not required for a parent's own acts to constitute endangerment under subsection (E). *See In re L.S.*, No. 10-22-00119-CV, 2022 WL 3655395, at *2 (Tex. App.—Waco Aug. 24, 2022, no pet.) (mem. op.). It is also not necessary to show that the parent's conduct was directed at the child or that the child suffered actual injury. *Boyd*, 727 S.W.2d at 533. The specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Id.* Furthermore, while the relevant time frame for evaluating endangerment under subsection (D) is before the child's removal, *In re J.W.*, 645 S.W.3d 726, 749 (Tex. 2022), we may consider conduct both before and after the child's removal in an analysis under subsection (E). *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

The relevant evidence presented in this case was as follows: DFPS Investigator Theresa Shamblin testified that she assisted a primary investigator in examining the allegations that eventually led to the filing of the underlying case. The initial allegation received by DFPS was that young children were seen unsupervised and were living in unsafe and unsanitary conditions. The primary investigator went to the home and met with Father and Mother. The primary investigator was not allowed to enter the home at that time, but she was able to see that the children were in the home. The primary investigator also reported that the back entrance of Father's and Mother's home was covered by a mattress and did not have a door. While speaking with the primary investigator, Father and Mother further confirmed that the electricity in the home had been shut off by the landlord to force them to leave the residence. Father and Mother stated, however, that they had been residing with Father's mother and staying at her home at night and that they were only at the home where the primary investigator visited because they were cleaning up and taking care of some things at the home.

Shamblin testified that shortly after DFPS received the initial allegation, DFPS received a second allegation regarding concerns about drug use and again about the conditions of the home and children. A safety plan was initiated at that time in which Father's and Mother's contact with the children became supervised by Father's mother and in which Father and Mother agreed to urinalysis drug testing. Father, Mother, and the children were all residing with Father's mother at that time.

Shamblin testified that later, after an assessment was scheduled, Father and Mother did not agree to services. An order for court-ordered services was therefore

sought.  Before the court-ordered services hearing, Father's mother reported that Mother had not been residing in the home.  The primary investigator also spoke with Mother on the phone, and Mother stated that she had been working at the house from which Father and Mother were being evicted and that she had been staying there.  Additionally, between the initiation of the safety plan and the court-ordered services hearing, Father was arrested for aggravated assault of Mother with a deadly weapon and incarcerated.

DFPS caseworker Amanda Stevenson next testified that she had been the caseworker for the children from July 2023 to December 12, 2023.  During her time as the caseworker, she had some communication with Father and Mother.  On July 28, she sent Father and Mother an email containing a list of the services that they needed to work from their service plan, as well as the contact information for each provider.

Stevenson testified that Mother thereafter completed some of the services that had been ordered by the trial court.  Mother completed her psychological evaluation on August 3, 2023.  Mother also began anger management and started counseling services. But Mother was referred for several other services and had not contacted them. Stevenson further testified that Mother had negative drug tests on May 17, June 7, and July 7, but that she then tested positive for amphetamine and methamphetamine in an August 22 drug test.  Mother subsequently failed to complete her drug testing on August 30, August 31, September 5, and September 18.  Stevenson's last communication with Mother was also in August 2023 after Mother's positive drug test, despite emails, phone calls, and text messages from Stevenson to Mother.

Stevenson testified regarding Father that he completed a psychological evaluation. Father also submitted to some drug testing, but he did not submit to drug testing on six occasions. Furthermore, like with Mother, Stevenson's last communication with Father was in August 2023, despite emails, phone calls, and text messages from Stevenson to Father.

Additionally, Stevenson testified that while she was the caseworker, she was informed several times by Father and Mother that they were having a very difficult time finding housing. Father and Mother lived in several different towns during this time, and while Stevenson was the caseworker, Father and Mother did not present any evidence to DFPS that they could provide safe and stable housing for the children. Additionally, the supervised visits between the parents and children had to be suspended on September 13, 2023, and did not begin again while Stevenson was the caseworker. Stevenson explained that Father and Mother were inconsistent with their visits with the children. Father and Mother were also not completing their drug testing for DFPS, so visitation had to be suspended until Father and Mother were willing to submit to drug testing again.

DFPS caseworker Sydney Noble next testified that she had been assigned as the caseworker for the children in mid-December 2023 and that she remained the caseworker through the time of trial in late-May 2024. When she was initially assigned to the case, she attempted to contact Mother but was unsuccessful. A hearing was then held in March 2024 because Father and Mother were wanting some additional time to work their services. Noble explained that it was her understanding that Father and Mother were

going to make a very concerted effort at that time to start diligently working their services; however, that did not happen.

Noble testified regarding Father that he did attempt to participate in therapy but that she had had only sporadic contact with him since the March hearing. Noble testified regarding Mother that she had consistently attended therapy and had also completed an Outreach, Screening, Assessment and Referral (OSAR) but that it was not the OSAR for which Mother had been referred by Noble; therefore, Noble had been unable to provide Mother's history to the person performing the assessment. Because of that, Noble referred Mother for a new drug and alcohol assessment, but Mother did not complete the assessment. At the March hearing, Mother was also ordered to take a hair follicle drug test. Mother did so, and it came back positive for methamphetamine. Mother was also required to drug test every two weeks thereafter, but she did not. In fact, Mother did not take another drug test after the hair follicle test. Noble testified that Mother did attempt to explain why her drug test results were positive for methamphetamine by providing two prescriptions. One of the prescriptions was for Vyvanse, which is an amphetamine. Stevenson also later added that in August 2023, Mother had shared with her that she was taking Vyvanse regularly because she has ADHD, and it was helping those symptoms.

Noble then testified that even though Mother had indicated at the March hearing that she and Father were no longer together, Father and Mother resided at the same residence. But Noble visited the home the day before trial and was told by the man who was living there that Mother had not been there in several weeks and that Father had recently been kicked out. Noble therefore explained that she did not know at that time

of a home to which the children could return with Father and Mother. Noble further testified that at the time of trial, Mother had a pending criminal charge for possession of a controlled substance in Leon County and that there was an arrest warrant for her for failure to appear in that case. Noble also believed that Father had pending criminal charges at the time of trial.

Finally, Noble testified that Father and Mother had had no visits with the children during the time that she was assigned to the case. Noble explained that it was DFPS policy that Father and Mother could not have visits with the children until Father and Mother had taken two consecutive negative urinalysis drug tests. Father and Mother knew about DFPS's policy but did not provide those negative drug tests. As a result, it was Noble's understanding that Father and Mother had not had contact with the children since August 2023.

A parent's drug use may support termination under subsection (E). *See J.O.A.*, 283 S.W.3d at 345; *see also In re R.R.A.*, 687 S.W.3d 269, 278 (Tex. 2024). The parent's failure to remain drug free while his rights to his child are in jeopardy may also support a finding of endangering conduct under subsection (E). *See Vasquez v. Tex. Dep't of Protective & Regul. Servs.*, 190 S.W.3d 189, 196 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). Additionally, a parent's failure to regularly participate in visitation can reasonably be found to be emotionally endangering to the child's well-being. *See In re A.F.*, No. 07-19-00435-CV, 2020 WL 2786940, at *7 (Tex. App.—Amarillo May 20, 2020, pet. denied) (mem. op.). In general, a parent's conduct that subjects children to a life of uncertainty and

instability endangers the physical and emotional well-being of those children. *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

The evidence here shows that Mother had two positive drug tests and that Mother and Father missed multiple required drug tests, resulting in those missed tests being deemed positive. *See J.W.*, 645 S.W.3d at 734 ("Mother missed twelve of fourteen scheduled drug tests, resulting in those missed tests being deemed positive."). What is more, because Father and Mother were missing required drug tests, neither had participated in visitation with the children in over nine months by the time of trial.

Considering the foregoing, we conclude that the evidence was legally and factually sufficient to establish that Father and Mother engaged in conduct that endangered the physical or emotional well-being of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Moreover, having concluded that the evidence was legally and factually sufficient to support the trial court's findings that Father and Mother violated subsection (E), we need not address Father's and Mother's arguments that the evidence was legally and factually insufficient to support the trial court's findings that they violated subsections (D) and (O). *See In re N.G.*, 577 S.W.3d 230, 232–33, 237 (Tex. 2019) (per curiam). We overrule Father's and Mother's fifth and sixth issues.

BEST INTEREST OF THE CHILDREN

In their seventh and eighth issues, Father and Mother contend that the evidence was legally and factually insufficient to support the trial court's findings that termination was in the children's best interest.

In determining the best interest of a child, several factors have been consistently considered, which were set out in the Texas Supreme Court's opinion of *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). This list is not exhaustive but simply identifies factors that have been or could be pertinent in the best-interest determination. *Id.* at 372. There is no requirement that all these factors be proven as a condition precedent to parental termination. *See C.H.*, 89 S.W.3d at 27. The absence of evidence about some factors does not preclude a factfinder from reasonably forming a strong conviction that termination is in the children's best interest. *Id.* In fact, while no one factor is controlling, the analysis of a single factor may be adequate in a particular situation to support a finding that termination is in the children's best interest. *In re J.M.T.*, 519 S.W.3d 258, 268 (Tex. App.—Houston [1st Dist.] 2017, pet. denied).

The *Holley* factors focus on the best interest of the children, not the best interest of the parent. *Dupree v. Tex. Dep't of Protective & Regul. Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ). And evidence relating to the predicate grounds under subsection 161.001(b)(1) may be relevant to determining the best interest of the children. *See C.H.*, 89 S.W.3d at 28.

Here, the DFPS caseworkers testified that Father and Mother had a very difficult time maintaining housing during this case, and Noble, who was the DFPS caseworker at the time of trial, stated that she did not know at that time of a home to which the children could return with Father and Mother. Furthermore, as stated above, the evidence showed that Mother had two positive drug tests and that Mother and Father missed multiple required drug tests, resulting in those missed tests being deemed positive. *See J.W.*, 645

S.W.3d at 734. Mother attempted to provide an excuse for her positive drug tests by providing a prescription for Vyvanse, which is an amphetamine, but Mother also tested positive for methamphetamine during this case. Additionally, as stated above, because Father and Mother were missing required drug tests, neither had participated in visitation with the children in over nine months by the time of trial. Evidence of past misconduct or neglect can be used to measure a parent's future conduct. *See Williams v. Williams*, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied); *Ray v. Burns*, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is often prologue."); *see also In re V.A.*, No. 13-06-00237-CV, 2007 WL 293023, at *5–6 (Tex. App.—Corpus Christi–Edinburg Feb. 1, 2007, no pet.) (mem. op.) (considering parent's past history of unstable housing, unstable employment, unstable relationships, and drug usage).

On the other hand, Noble testified that C.M. and R.M. were placed with Father's mother at the time of trial and that K.N. was in a foster placement. Noble further stated that each of those placements was willing to adopt the children.

There is a strong presumption that it is in the child's best interest to preserve the parent-child relationship. *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). However, considering all the evidence in the light most favorable to the trial court's findings and considering the evidence as a whole, we hold that a reasonable factfinder could have formed a firm belief or conviction that termination of Father's and Mother's parental rights was in the children's best interest. Accordingly, we overrule Father's and Mother's seventh and eighth issues.

**Judicial Notice**

We now turn to Father's and Mother's first two issues. During DFPS's case-in-chief, the following exchange took place:

> [DFPS'S COUNSEL]: Judge, at this time we'd ask the Court to take judicial notice of the Court's file and the contents and pleadings on file . . . .
>
> THE COURT: The Court will take judicial notice - -
>
> First, are there any objections to the Court taking judicial notice of the entirety of the Court's file?
>
> [FATHER'S COUNSEL]: I don't take - - I don't object to taking notice of what the pleadings are; but of the contents, I do object.
>
> THE COURT: Okay. [Mother's counsel]?
>
> [MOTHER'S COUNSEL]: I join that objection, Judge.
>
> . . . .
>
> THE COURT: Okay. Your objections are noted[,] and they are overruled. The Court is going to take notice of the entirety of the file.

Father and Mother contend in their first two issues that the trial court erred in overruling their objections and in taking judicial notice of the entirety of the court's file.

A trial court may take judicial notice of its own records in matters that are generally known, easily proven, and not reasonably disputed. *In re J.E.H.*, 384 S.W.3d 864, 870 (Tex. App.—San Antonio 2012, no pet.); *see* TEX. R. EVID. 201. Father and Mother suggest, however, that by taking judicial notice of the contents of the file, the trial court may have taken judicial notice of the truth of statements and allegations contained in the contents of the file. But there is no indication that the trial court took judicial notice of

the truth of any statements or allegations contained in the contents of the file. *See, e.g., In re C.J.*, No. 02-24-00197-CV, 2024 WL 3387348, at *2 (Tex. App.—Fort Worth July 12, 2024, no pet.) (mem. op.). Nor did Father or Mother object on that basis. *See Arroyo Shrimp Farm, Inc. v. Hung Shrimp Farm, Inc.*, 927 S.W.2d 146, 151 (Tex. App.—Corpus Christi–Edinburg 1996, no writ) ("[T]he grounds supporting an objection made during trial must conform with the argument supporting the corresponding point of error on appeal. An objection made during trial which is not the same as the argument urged on appeal presents nothing for appellate review." (citations omitted)).

We therefore overrule Father's and Mother's first and second issues.

## Conclusion

Having overruled all Father's and Mother's issues, we affirm the trial court's order of termination.

MATT JOHNSON
Chief Justice

Before Chief Justice Johnson,
     Justice Smith, and
     Justice Harris
Affirmed
Opinion delivered and filed February 6, 2025
[CV06]

