

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-25-00790-CV

**IN THE INTEREST OF E.M.M. JR.**, N.M.M., N.J.M., I.A.M., M.S.R., A.L.M., Children

From the 408th Judicial District Court, Bexar County, Texas
Trial Court No. 2024-PA-00748
Honorable Raul Perales, Judge Presiding

Opinion by:    Lori I. Valenzuela, Justice

Sitting:        Rebeca C. Martinez, Chief Justice
                Lori I. Valenzuela, Justice
                H. Todd McCray, Justice

Delivered and Filed: April 29, 2026

AFFIRMED

Appellant A.R. ("Mother") appeals the trial court's order terminating her parental rights to her children, E.M.M. Jr. (born 2016), N.M.M. (born 2017), N.J.M. (born 2018), I.A.M. (born 2020), M.S.R. (born 2022), and A.L.M. (born 2023).[1] In Mother's sole appellate issue, she contends the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in the children's best interest. We affirm.

---

[1] To protect the privacy of the minor children, we use initials to refer to the children and pseudonyms to refer to their parents. TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

BACKGROUND

In October of 2023, the Texas Department of Family and Protective Services (the "Department") received a referral after Mother and A.L.M. tested positive for marijuana when A.L.M. was born. During the investigation, the older children made outcries that they had witnessed domestic violence committed by their father, E.M. ("Father") against Mother. The Department implemented a safety plan that required the children's maternal and paternal grandmothers to act as monitors for Mother and Father.

In January of 2024, the Department was notified that Mother and Father had both separately violated the safety plan. The Department, Mother, and Father "did a family team meeting to address the break in [the] safety plan and to talk about the importance of the safety plan," but Mother "refused" to participate. Mother "informed [the Department's investigator] that she was no longer going to comply with the Department or willing to do services."

On May 3, 2024, the Department received a re-referral based on concerns surrounding "the living condition of the home and, also, possible drug usage by mom[.]" At that time, Mother and the children were living with Mother's father in a home that did not have electricity, and there were "markings observed on the children." The Department subsequently removed the children on grounds of neglectful supervision and placed them with Father's mother, where they remained throughout this case. The Department also filed a petition to terminate Mother's and Father's parental rights.

The Department generated family service plans for Mother and Father. Mother's plan required her to submit to a psychological assessment, individual therapy, drug testing, substance abuse assessment, and parenting and domestic violence classes. The plan also required her to

provide proof of stable housing and employment. Mother did not sign the service plan, but the Department's caseworker testified that she reviewed it with Mother and Mother understood it.

On August 20, 2025, September 12, 2025, and November 3, 2025, the trial court held a bench trial on the Department's termination petition. The Department asked the trial court to terminate Mother's parental rights and appoint Father as the children's sole managing conservator. Four witnesses testified at trial: Department investigator Antonio Bustamante; Mother; Father; and Department caseworker Kayla Arguello. At the conclusion of the trial, the trial court signed an Order of Termination terminating Mother's parental rights pursuant to section 161.001(b)(1)(E), (N), and (P)[2] and its finding that termination of Mother's parental rights was in the children's best interest. The trial court also adjudicated Father as the father of all six children and appointed him as their sole managing conservator.

Mother timely filed this appeal. She challenges only the legal and factual sufficiency of the evidence supporting the best interest finding.

## ANALYSIS

### *Standard of Review*

To terminate parental rights pursuant to Family Code section 161.001, the Department has the burden to prove by clear and convincing evidence: (1) one of the predicate grounds in subsection 161.001(b)(1); and (2) that termination is in the best interest of the child. *See* TEX. FAM. CODE §§ 161.001(b), 161.206(a).

When reviewing the sufficiency of the evidence, we apply well-established standards of review. *See* TEX. FAM. CODE §§ 101.007, 161.206(a); *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex.

---

[2] The Texas Legislature recently amended section 161.001(b)(1) to delete one ground for termination and renumber other grounds. While the judgment in this case was signed after the amendment took effect on September 1, 2025, it relies on the version of subsection (P) that existed prior to the amendment. The other grounds cited in the trial court's judgment were not changed by the recent amendment.

2006) (per curiam) (factual sufficiency); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam) (legal sufficiency). The trier of fact is the sole judge of the credibility of witnesses and the weight to be given to their testimony. *In re J.P.B.*, 180 S.W.3d at 573. Where, as here, the trial court acts as factfinder in a bench trial, "the trial judge is best able to observe and assess the witnesses' demeanor and credibility, and to sense the 'forces, powers, and influences' that may not be apparent from merely reading the record on appeal." *In re A.L.E.*, 279 S.W.3d 424, 427 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (citation omitted). We therefore defer to the trial court's judgment regarding credibility determinations. *See id.*

### *Best Interest*

When considering the best interest of the child, we recognize the existence of a strong presumption that the child's best interest is served by preserving the parent-child relationship. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). "[T]he best interest standard does not permit termination [of parental rights] merely because a child might be better off living elsewhere." *In re A.H.*, 414 S.W.3d 802, 807 (Tex. App.—San Antonio 2013, no pet.) (citation omitted). We also presume that prompt and permanent placement of the child in a safe environment is in the child's best interest. TEX. FAM. CODE § 263.307(a). The Department has the burden of rebutting these presumptions with clear and convincing evidence. *See, e.g.*, *In re R.S.-T.*, 522 S.W.3d 92, 97 (Tex. App.—San Antonio 2017, no pet.). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007; *In re R.S.-T.*, 522 S.W.3d at 97. To determine whether the Department satisfies its burden, the Texas Legislature has provided several statutory factors[3] for courts to consider regarding a parent's willingness and

---

[3] The statutory factors include: "(1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4)

ability to provide a child with a safe environment, and the Texas Supreme Court has provided a similar list of factors[4] to determine a child's best interest. TEX. FAM. CODE § 263.307(b); *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

A best interest finding does not require proof of any particular factors. *In re G.C.D.*, No. 04-14-00769-CV, 2015 WL 1938435, at \*5 (Tex. App.—San Antonio Apr. 29, 2015, no pet.) (mem. op.). Neither the statutory factors nor the *Holley* factors are exhaustive, and "[e]vidence of a single factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child's best interest." *In re J.B.-F.*, No. 04-18-00181-CV, 2018 WL 3551208, at \*3 (Tex. App.—San Antonio July 25, 2018, pet. denied) (mem. op.). Evidence that proves a statutory ground for termination is probative on the issue of best interest. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). "A trier of fact may measure a parent's future conduct by [her] past conduct [in] determin[ing] whether termination of parental rights is in the child's best interest." *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). In analyzing these factors, the court must focus on the best interest of the child, not the best interest of the parent. *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ).

---

whether the child has been the victim of repeated harm after the initial report and intervention by the department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills [. . .]; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child." TEX. FAM. CODE § 263.307(b).

[4] The *Holley* factors include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist those individuals to promote the best interest of the child; (6) the plans for the child by these individuals or the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley*, 544 S.W.2d at 371–72.

***Application***

Because Mother did not challenge the statutory grounds for termination, including the trial court's finding of constructive abandonment under subsection (N), we must accept those findings as true. *See In re S.J.R.-Z.*, 537 S.W.3d 677, 682–83 (Tex. App.—San Antonio 2017, pet. denied); Tex. Fam. Code § 161.001(b)(1)(N). While the constructive abandonment finding did not relieve the Department of proving termination was in the children's best interest, the same evidence may be probative on both issues. *In re C.H.*, 89 S.W.3d at 28.

The evidence showed that for 175 days during this case, Mother ceased communicating with the Department and did not visit the children. Arguello testified that "to [her] knowledge," Mother did not have contact with the children between November 7, 2024 and May 1, 2025. Mother agreed that there was "an extensive time" that she did not visit the children, but she testified that she "was going through . . . a life crisis" at that time due to the children's removal. Arguello testified that Mother told her she did not want the children to see her because she was being abused by her then-boyfriend. Arguello did not consider this a valid reason for failing to visit the children.[5] Father testified that Mother's failure to visit the children "affected them a whole lot because at that time they were just wondering like where is their mom, where is their mom, you know." *See In re K.J.J.*, No. 04-24-00585-CV, 2024 WL 5151150, at *3–4 (Tex. App.—San Antonio Dec. 18, 2024, pet. denied) (mem. op.) (considering child's reaction to parent's missed visits). The trial court could have properly determined that Mother's failure to visit the children supported a finding that termination was in their best interest. *See In re A.L.W.*, No. 04-24-00874-CV, 2025 WL 2158523, at *4 (Tex. App.—San Antonio July 30, 2025, pet. denied) (mem. op.).

---

[5] Mother testified that her former boyfriend was incarcerated and that she ended the abusive relationship before trial.

A parent's failure to timely engage in a service plan is also relevant to a best interest analysis. *See In re K.J.J.*, 2024 WL 5151150, at *5. Mother argues that she "was given 18 months to complete her service plan, and she used the time to complete most of the service plan." By the last day of trial, Mother had completed a parenting class, a domestic violence class, a drug treatment program and a psychological evaluation. However, the evidence showed that while the children were removed in January of 2024, Mother did not begin engaging in her service plan until August of 2025. Mother conceded that she did not start working on her services until shortly before trial, and she agreed that she was hoping she could delay the trial by doing so. Arguello testified that Mother had very little participation in this case, including visits with the children, until one month before the trial started.

By the end of trial, Mother had not yet begun the individual counseling required by her plan, which Arguello testified was necessary for Mother to address her mental health issues. Arguello testified that Mother had offered various reasons for this:

> First it was that she believed she didn't need counseling; second was that she couldn't get ahold of the therapist; and then she stated that she had already covered that in substance abuse. I explained that substance abuse and mental health are two separate entities. And that now [the reason is] they haven't called her.

Arguello testified that Mother "continuously has stated that Court orders are not real, that this is not real." She also testified, "Every time I bring something up, [Mother] wants to argue about it[.]" Even though Mother ultimately completed most of her service plan, the trial court could have reasonably found that her late start to the plan and her reluctance to cooperate with the Department weighed in favor of termination. TEX. FAM. CODE § 263.307(b)(10), (11); *In re K.J.J.*, 2024 WL 5151150, at *5.

Much of the evidence focused on Mother's drug use. *See* TEX. FAM. CODE § 263.307(b)(8). "Parental drug abuse reflects poor judgment and may be a factor to consider in determining a

child's best interest." *In re J.M.T.*, 519 S.W.3d 258, 269 (Tex. App.—Houston [1st Dist.] 2017, pet. denied); *see also In re L.G.R.*, 498 S.W.3d 195, 204 (Tex. App.—Houston [14th Dist. 2016, pet. denied) (noting parent's drug use supports finding that termination is in best interest of child). Illegal drug use is relevant to multiple best interest considerations, both statutory and *Holley* factors, including a child's emotional and physical needs now and in the future, a parent's parental abilities, stability of the home, and a parent's acts or omissions pertinent to determining whether the parent-child relationship is improper. *See Holley*, 544 S.W.2d at 371–72.

Mother underwent both hair follicle and urinalysis tests during this case. Arguello testified that a hair follicle test "goes back 90 days, and a urine test is three to five days of usage." A June 2025 hair follicle test showed that Mother was positive for amphetamines, methamphetamines, and marijuana, while a urinalysis conducted the same day was negative for those substances. After those tests, and approximately a month before the trial began in this case, Mother gave birth to a seventh child on July 31, 2025. Mother acknowledged that both she and that child tested positive for amphetamines when the child was born.[6] As a result, "[t]he trial court heard evidence that [Mother] engaged in illegal drug use while this case was pending." *In re J.M.T.*, 519 S.W.3d at 269.

Additionally, Mother agreed that she missed most of the drug tests the Department tried to send her to during this case. On the second day of trial, Arguello testified that the Department sent Mother for eleven drug tests and Mother submitted to only three. The trial court could have reasonably concluded that Mother missed those tests because she was still using illegal substances. *See In re E.R.W.*, 528 S.W.3d 251, 265 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

---

[6] Mother's seventh child was removed by the Department at birth. At that time of the trial in this case, that child was the subject of a separate Department proceeding.

Mother testified that she had not used any illegal substances since her youngest child's birth in July 2025, and she notes on appeal that the Department did not present written documentation of any drug tests that contradicted that testimony. Additionally, the trial court ordered Mother to undergo a hair follicle test between the second day of trial in September 2025 and the third day of trial in November 2025, and Arguello testified that the results of that test were not concerning. Arguello also testified, however, that Mother asked her to tell her Department supervisor that Mother did not need to do the court-ordered hair follicle test. *See* TEX. FAM. CODE § 263.307(b)(10), (11). Furthermore, Arguello testified that Mother tested positive for marijuana on August 13, 2025 and August 27, 2025—*i.e.*, after her youngest child's birth—and that those positive results came from urinalysis tests that would indicate usage during the preceding three to five days. *See In re J.M.T.*, 519 S.W.3d at 269. The trial court could have credited Arguello's testimony about the August test results over Mother's contrary claims that she had not used since July. *See In re E.N.T.*, No. 01-25-00346-CV, 2025 WL 3083879, at *32 (Tex. App.—Houston [1st Dist.] Nov. 5, 2025, no pet.) (mem. op.). But even if the trial court credited Mother's testimony, "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices." *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

On appeal, Mother argues that there is no evidence of the children's desires to support the best interest finding. *See Holley*, 544 S.W.2d at 371–72. But Arguello testified that the oldest child, E.M.M. Jr., did not attend visits with Mother because he had told the Department that he did not want to. By the third day of trial on November 3, 2025, E.M.M. Jr. had apparently changed his mind and attended "the last two visits," but Arguello reiterated that he previously stated "he didn't

want to go." Arguello also testified, "When there's a missed visit [with Mother], it's just another day to" the children.

Mother contends that the evidence showed she had a stable home and employment and that those factors weigh against termination. *See id.* Mother testified that she started working at a restaurant two weeks before the second day of trial. She described her employer as "a barbeque family-oriented restaurant" and testified that while the restaurant had a bar, she did not work in the bar. Arguello testified that she was concerned about Mother's job because "[s]omeone who is in recovery should not be working in an environment like that." However, the Department did not present any evidence that Mother had ever had problems with alcohol.[7] We agree with Mother that the evidence about her employment did not weigh in favor of termination.

We reach a different conclusion as to the stability of Mother's residence. Mother testified that between January of 2025 and the second day of trial in September 2025, she lived in an apartment with her sister. When Arguello visited that apartment, Mother "would not let [her] in the home at first. . . . She stated that her dad was in the living room getting dressed, so [Arguello] could not enter at that time." When Mother gave Arguello permission to enter the apartment, Arguello observed that "[t]he home had an odor of cigarettes. It was not sanitary. And there was only a twin mattress and a crib[.]" Arguello testified that "there was another room that was closed," and when she asked to see that room, Mother told her "that it was a private area and [Arguello] could not enter." At the conclusion of the second day of trial, the trial court ordered Mother to allow the Department "to have access to the entire apartment where mom lives."

Arguello never inspected the entirety of that apartment, because Mother moved into a different apartment shortly before the last day of trial. Arguello testified that when she visited the

---

[7] While Arguello testified that she saw beer cans in Mother's previous apartment, Mother testified without contradiction that she does not drink and the beer cans belonged to her father.

new apartment, "[i]t looked like no one was living in there" because "[t]here was empty closets, empty cabinets; no sign of like somebody that had moved in being there." When Arguello asked for a copy of Mother's lease, Mother "just sent [her] the first page" and told her "unless it was Court ordered, that's the only page [Arguello] was getting." Mother disagreed with Arguello's testimony that the apartment was empty, testifying that she "had two beds in there. It was two beds. I had stuff in my shower. I put everything in there. It wasn't empty. It just didn't have any food for the cabinets because I just got the apartment." Mother also presented a signed copy of the entire lease at trial. She did not dispute that she had previously refused to give a copy to Arguello.

The trial court could have properly credited Arguello's testimony about the state of the new apartment over Mother's. *See In re N.R.V.*, No. 04-14-00844-CV, 2015 WL 2255088, at *2 (Tex. App.—San Antonio May 13, 2015, no pet.) (mem. op.). The court also could have properly considered Mother's refusal to cooperate with Arguello's requests. TEX. FAM. CODE § 263.307(b)(10).

Mother argues that the evidence about the children's present and future emotional and physical needs does not support termination. *See Holley*, 544 S.W.2d at 371–72. She testified that her bond with the children is strengthening and they were always excited and happy to see her. But Father testified that Mother "put[s] things in [the children's] head" and that when the children return from visits with her, "they're just confused. They don't know what—like they just don't know what's going on right now, and they just come home feeling like different things." *See In re C.R.*, No. 04-20-00200-CV, 2020 WL 5646473, at *6 (Tex. App.—San Antonio Sept. 23, 2020, no pet.) (mem. op.) (considering evidence that children did not want to see parent and their behavior worsened after visits). He believed Mother was "just making things harder for" the children. Similarly, Arguello testified, "There's concerns that [Mother] is bribing the kids to come

to the visits. There's no discipline when they're doing things that can harm them." Arguello also testified that Mother asked to move the visits so that they occurred between six and eight p.m., but the Department declined because "that would interfere with [the children's] bedtime." The trial court could have concluded this evidence was probative of Mother's understanding of the children's needs and her ability to discipline, guide, and supervise them. TEX. FAM. CODE § 263.307(b)(12)(B), (C), (F).

Father also testified that when N.M.M. returned from a recent visit with Mother, he had a "dirty" toy she had given him that smelled of marijuana. Mother testified that she bought the toy at a "Black Friday store" and that it did not smell like marijuana when she gave it to N.M.M. The toy was admitted into evidence at trial, and a picture in the appellate record shows that it was covered in a black residue. The trial court did not make any findings on the record about the object's smell or what it believed the black residue to be. However, after reviewing the picture and the witnesses' testimony, we believe the trial court could have reasonably found that the toy was not a safe or appropriate gift for a parent to give a child. The trial court could have concluded that this exhibit was relevant to Mother's parenting skills, including her ability to provide appropriate guidance and supervision and a safe home environment. *Id.* § 263.307(b)(12)(C), (D).

Arguello testified that Father completed all his services and the children had been reunited with him. She described Father's home as "stable . . . free of substance abuse, domestic violence, and homelessness." *Id.* § 263.307(a). She added that the children had been discharged from therapy, noting, "[T]hey're doing well. They're happy. They have a routine." *See id.* Father testified that Mother, in contrast, "does not provide for [the children]. She neglects them. She just puts things in their heads; puts them at harm; just has drugs around them[.]" Father testified that Mother had not changed her past behavior and that she could "[p]ossibly" harm the children

psychologically. Arguello similarly testified that she did not believe Mother had addressed the reasons for the children's removal.

After reviewing the evidence under the appropriate standards of review, we conclude the trial court could have formed a firm belief or conviction that termination of Mother's parental rights was in the children's best interest. Additionally, the evidence contrary to the finding was not so overwhelming as to render the finding manifestly wrong or unjust. Because the evidence is therefore legally and factually sufficient to support the trial court's best interest finding, we overrule Mother's sole issue.

## CONCLUSION

We affirm the order of termination.

Lori I. Valenzuela, Justice